

FILE
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE MAR 3 1 ...6

Madsen, C.J.
CHIEF JUSTICE

This opinion was filed for record
at 8:00 am on Mar 31, 2016

Ronald R. Carpenter
Supreme Court Clerk

IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | |
| Respondent, | ) | No. 91331-5 |
| | ) | |
| v. | ) | En Banc |
| | ) | |
| TROY J. WILCOXON, | ) | |
| | ) | Filed    MAR 3 1 2016 |
| Petitioner. | ) | |
| | ) | |

OWENS, J. – The United States Constitution affords criminal defendants the right to confront witnesses presented against them, usually by means of cross-examination at trial. U.S. CONST. amend. VI. This confrontation right is often implicated when statements made outside of court are later presented at trial by someone other than the original speaker because the defendant cannot cross-examine the original speaker about the statements. However, the United States Supreme Court has held that not all out-of-court statements give rise to the protections of the confrontation right because not all speakers are acting as a "witness" against the accused as described in the Sixth Amendment. *Crawford v. Washington*, 541 U.S.

36, 51, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). As the Court explained, only those who "'bear testimony'" against the accused are "'witnesses'" within the meaning of the Sixth Amendment. *Id.* (quoting 2 NOAH WEBSTER, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828)). That United States Supreme Court precedent is controlling in this case. Today, petitioner Troy Wilcoxon asks us to find that his confrontation right was violated when his codefendant's out-of-court statement was admitted at trial and Wilcoxon did not have the opportunity to cross-examine his codefendant. However, since the out-of-court statements were not testimonial, they are not subject to the confrontation right. Consequently, we find that Wilcoxon's confrontation right was not violated and affirm his conviction.

## FACTS

Someone attempted to burglarize Lancer Lanes and Casino around 2:00 a.m. on May 14, 2013. Video surveillance showed that the burglar wore a large black plastic garbage bag. The burglar cut the surveillance feed. However, the burglar's activities awoke Eric Glasson, an individual who occasionally slept overnight at Lancer Lanes, and Glasson's presence apparently spooked the burglar into leaving without taking anything.

On May 23, Wilcoxon, a card dealer at Lancer Lanes, invited Glasson, James Nollette, and two other casino employees to a "strip club" called the Candy Store. Verbatim Report of Proceedings (VRP) (Jan. 7, 2014) at 118 (Volume A). The

State's theory of the case was that the purpose of inviting Glasson and the other casino employees to the Candy Store was to get them out of Lancer Lanes so the burglary could occur without any interference. The group arrived around midnight, but Wilcoxon left by himself less than an hour later after talking privately with Nollette. Shortly after 2:00 a.m., the Candy Store's surveillance footage showed Nollette talking on his cell phone with someone—the conversation lasted roughly 15 minutes. Cell phone records showed several calls between Nollette and Wilcoxon around 2:00 a.m. Wilcoxon's phone's signal relied on a cell tower near Lancer Lanes. Soon after Nollette's conversation ended, Nollette, Glasson, and the two casino employees left the Candy Store.

That same night, surveillance footage from Lancer Lanes showed the same garbage-bag-wearing burglar enter the building just before 2:00 a.m. The burglar again cut the surveillance feed, but this time, the cameras were backed up by batteries and recorded the burglary. Surveillance footage showed the burglar take $29,074 from Lancer Lanes's money drawer.

Sometime after 2:00 a.m., Wilcoxon and Nollette went to their friend Eric Bomar's house. Wilcoxon and Nollette both appeared "excited." VRP (Jan. 9, 2014) at 503 (Volume C). Bomar testified that Wilcoxon discussed going to Lancer Lanes and "getting away with it," referring to the Lancer Lanes burglary. *Id.* at 504-05. Bomar testified that Wilcoxon described to him how he had burglarized Lancer Lanes,

including that he had entered through the back door, disabled the security cameras, and used keys to access the money drawer. Bomar also testified that in the past he had heard both Wilcoxon and Nollette discuss how easy it would be to break in and steal money from Lancer Lanes.

In June, Nollette confided in his friend Gary Solem. Nollette told Solem that he had been "at a friend's house" and that his "friend asked him, . . . if you were going to rob a place or hold a place up in town, . . . what [place] would you do?" VRP (Jan. 8, 2014) at 301 (Volume B). Nollette responded to his friend that "if it was me, . . . I would . . . rob . . . Lancer's Lane." *Id.* Additionally, Nollette told Solem that "his friend had . . . broken into . . . Lancer's and that . . . in the middle of the burglary, [Nollette] was over at the Candy Store," and that "while they were over there, [Nollette] received a phone call and he went outside to talk to his friend in the middle of the burglary." *Id.* at 304. Nollette did not directly identify Wilcoxon as the "friend" to Solem. *See id.* at 304-11.

Later in June, the State charged Wilcoxon with second degree burglary, first degree theft, and second degree conspiracy to commit burglary. Wilcoxon's case was joined for trial with Nollette's case.[1] Prior to trial, Wilcoxon moved to sever his trial from Nollette's trial pursuant to CrR 4.4(c)(2), arguing that since Nollette would

---

[1] The State charged Nollette with second degree burglary, first degree theft, and second degree conspiracy to commit burglary. *See* Clerk's Papers at 31, 54.

4

likely not testify, Wilcoxon would be unable to cross-examine him regarding the statements Nollette made to Solem. The trial court denied Wilcoxon's motion. Wilcoxon did not renew his motion to sever before or at the close of all the evidence. Wilcoxon did not object to Solem's testimony regarding Nollette's statements, and Wilcoxon did not request a limiting instruction.

The jury convicted Wilcoxon of all three charges. It returned a special verdict that his theft and burglary convictions were "major economic offense[s]" and that Wilcoxon abused a position of trust to commit those crimes. Clerk's Papers (CP) at 86-87. Wilcoxon appealed, arguing that the trial court violated his confrontation right by denying his severance motion and failing to provide a limiting instruction sua sponte.[2] The Court of Appeals affirmed Wilcoxon's convictions, finding no confrontation right violation or requirement to provide a limiting instruction sua sponte. *State v. Wilcoxon*, 185 Wn. App. 534, 540, 542, 341 P.3d 1019 (2015). We granted discretionary review. *State v. Wilcoxon*, 183 Wn.2d 1002, 349 P.3d 856 (2015).

## ISSUES

1. Was Wilcoxon's confrontation right violated?

2. If the trial court erred, was the error harmless beyond a reasonable doubt?

---

[2] Since Wilcoxon did not renew his motion to sever during trial and CrR 4.4(a)(2) provides that "[s]everance is waived by failure to renew the motion," Wilcoxon does not rely on his right to severance pursuant to CrR 4.4 on this appeal.

ANALYSIS

*1. The Trial Court Did Not Violate Wilcoxon's Confrontation Right*

Wilcoxon asks us to find that his confrontation right was violated when the court admitted out-of-court statements by his codefendant, who did not testify at trial. However, as explained in detail below, the United States Supreme Court has held that nontestimonial statements do not fall within the scope of the confrontation clause, and in this case, the statements at issue were not testimonial. Therefore, the statements did not fall within the scope of the confrontation clause and Wilcoxon's confrontation right was not violated.

*A. The Confrontation Clause, Out-of-Court Statements by Nontestifying Codefendants, and the* Bruton *Doctrine*

The confrontation clause of the Sixth Amendment provides, "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. It ensures protection of the right of criminal defendants to confront witnesses testifying against him or her at trial. Defendants generally exercise the confrontation right by cross-examining these witnesses. We review alleged violations of the confrontation clause de novo. *State v. Jasper*, 174 Wn.2d 96, 108, 271 P.3d 876 (2012).

Separately, the Fifth Amendment provides criminal defendants the right against self-incrimination. U.S. CONST. amend. V. This affords defendants the right to refuse to testify. Sometimes this right and the confrontation right can create tension when

two defendants are tried together as codefendants for the same offense. Specifically, a conflict can arise when one defendant makes a statement outside of court that implicates a codefendant and then that statement is related in the joint trial by a third party who heard the statement. This can be problematic where the speaker of the statement chooses to invoke his Fifth Amendment right not to testify in court because the codefendant does not have the opportunity to cross-examine the actual speaker of the out-of-court statement.

The United States Supreme Court addressed this conflict in *Bruton v. United States,* 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968). The Court found that the admission of an out-of-court statement by a nontestifying codefendant violated the defendant's confrontation right. *Id.* at 128. There, Bruton and a man named Evans were prosecuted jointly for an armed postal robbery. *Id.* at 124. Before trial, a postal inspector interrogated Evans in jail. *Id.* Evans confessed to the crime and implicated Bruton. *Id.* At trial, Evans did not take the stand but the postal inspector testified that Evans confessed to committing the crime with Bruton. *Id.* The trial court instructed the jury to disregard the confession as to Bruton's guilt or innocence. *Id.* Ultimately, the jury convicted Bruton. *Id.* The Court reversed, holding that the use of Evans's confession violated Bruton's confrontation right, even with the limiting instruction. *Id.* at 128. It reasoned that Evans's confession added "critical" weight to the case against Bruton, in a form that was not subject to cross-examination. *Id.* at 127-28.

Following *Bruton*, the Supreme Court explored the *Bruton* doctrine by fleshing out how a *Bruton* violation should be handled and what curative measures could be implemented to avoid the effect a codefendant's confession could have on the nonconfessing defendant's defense. *See, e.g.*, *Harrington v. California*, 395 U.S. 250, 252-55, 89 S. Ct. 1726, 23 L. Ed. 2d 284 (1969) (holding that erroneous admission of a statement at a joint trial does not necessarily require reversal, as such an error is subject to harmless error analysis); *Parker v. Randolph*, 442 U.S. 62, 75, 99 S. Ct. 2132, 60 L. Ed. 2d 713 (1979) (holding that a proper limiting instruction can allow admission of interlocking confessions to comport with the Sixth and Fourteenth Amendments to the federal constitution).

Wilcoxon argues that his case is similar to *Bruton* and, therefore, his confrontation right was likewise violated. However, as explained below, the United States Supreme Court has since refined its confrontation clause jurisprudence, limiting its scope to testimonial statements.

*B. Limitation of the Confrontation Clause to Testimonial Statements*

In 2004, the Supreme Court effectively changed the landscape of its confrontation clause analysis in *Crawford*, 541 U.S. at 42. In *Crawford*, the Court considered the admission of an out-of-court recorded statement made to police against Crawford and held that the confrontation clause barred its admission because the statement was "testimonial." *Id.* at 40, 68. The Court examined the historical lineage

8

of the defendant's right to prior cross-examination of an unavailable witness presented against him. *Id.* at 43-50. Using a textual approach, it found that the confrontation clause "applies to 'witnesses' against the accused—in other words, those who 'bear testimony.'" *Id.* at 51 (quoting 2 WEBSTER, *supra*). Thus, it found that the confrontation clause was primarily concerned with testimonial statements. *Id.*

While it was clear under *Crawford* that the confrontation clause certainly applied to testimonial out-of-court statements, it was unclear how nontestimonial statements should be handled. The Court answered that question in *Davis v. Washington*, finding that nontestimonial statements are outside of the scope of the confrontation clause. 547 U.S. 813, 821-24, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006). Only testimonial statements "cause the declarant to be a 'witness' within the meaning of the Confrontation Clause." *Id.* at 821 (quoting *Crawford*, 541 U.S. at 51). The Court thus found that "[u]nder *Crawford*, . . . the Confrontation Clause has no application to [nontestimonial] statements and therefore permits their admission even if they lack indicia of reliability." *Whorton v. Bockting*, 549 U.S. 406, 420, 127 S. Ct 1173, 167 L. Ed. 2d 1 (2007). Therefore, if the statement is nontestimonial, it is not subject to the confrontation clause.

*Crawford* and *Davis* advised on how to answer the threshold question of whether a statement is testimonial. In general, where the statement is functionally trial testimony, it is testimonial; where it is just a casual statement made to a friend, it

is nontestimonial. *Crawford*, 541 U.S. at 51. Only after a court concluded that a given statement is testimonial would it proceed to analyze the confrontation clause.

Wilcoxon asks us to disregard *Crawford*'s and *Davis*'s limitation on the confrontation clause to testimonial statements and apply the *Bruton* doctrine without considering whether the statements were testimonial. The next section will examine whether *Crawford*'s limitation applies to situations covered by the *Bruton* doctrine.

C. *Harmonizing the* Bruton *Doctrine and* Crawford

Post-*Crawford*, the question we must answer is whether the *Bruton* doctrine must be viewed through the lens of *Crawford*, or whether Wilcoxon's case must be analyzed only under *Bruton*. Given the scope and reasoning of *Crawford*, we conclude that it applies in situations that, like *Bruton*, involve out-of-court statements by nontestifying codefendants. *Crawford* reimagined the scope of the confrontation clause. As the United States Supreme Court later explained, the core of the confrontation clause is to protect defendants from *testimony* against him or her. *Davis*, 547 U.S. at 823-34. Thus, it follows that the scope of the confrontation right encompasses only testimonial statements. Its protections simply do not apply to nontestimonial statements, whether in the context of a single defendant like in *Crawford* or codefendants like in *Bruton*.

As support for the limitation, the Court pointed out in *Davis* that the great majority of confrontation cases throughout American jurisprudence involved

10

testimonial statements. *Id.* at 824-26. Indeed, *Bruton* itself involved a testimonial statement—Evans's confession to the postal inspector was received during interrogation, which he could reasonably expect would be used prosecutorially. 391 U.S. at 124. Although *Bruton* did not contemplate a distinction between testimonial and nontestimonial statements, if decided today it would meet the threshold question and further confrontation analysis would follow. Thus, limiting the *Bruton* doctrine to testimonial hearsay is the natural conclusion under *Crawford*.

The majority of federal appellate courts that have considered this issue have come to the same conclusion. They have held that under *Crawford* and *Davis*, the confrontation clause applies only to situations that involve out-of-court statements made by nontestifying codefendants when such statements are testimonial. *See, e.g., United States v. Figueroa-Cartagena*, 612 F.3d 69, 85 (1st Cir. 2010) ("It is . . . necessary to view *Bruton* through the lens of *Crawford* and *Davis*. The threshold question in every case is whether the challenged statement is testimonial. If it is not, the Confrontation Clause 'has no application.'" (quoting *Whorton*, 549 U.S. at 420)); *United States v. Berrios*, 676 F.3d 118, 128 (3rd Cir. 2012) ("[B]ecause *Bruton* is no more than a by-product of the Confrontation Clause, the Court's holdings in *Davis* and *Crawford* likewise limit *Bruton* to testimonial statements."); *United States v. Dargan*, 738 F.3d 643, 651 (4th Cir. 2013) ("*Bruton* is simply irrelevant in the context of nontestimonial statements."); *United States v. Johnson*, 581 F.3d 320, 326 (6th Cir.

2009) ("Because it is premised on the Confrontation Clause, the *Bruton* rule, like the Confrontation Clause itself, does not apply to nontestimonial statements."); *United States v. Spotted Elk*, 548 F.3d 641, 662 (8th Cir. 2008) ("It is now clear that the Confrontation Clause does not apply to non-testimonial statements by an out-of-court declarant."); *United States v. Clark*, 717 F.3d 790, 816 (10th Cir. 2013) (concluding that because a coconspirator's out-of-court statements were nontestimonial, "they [fell] outside the protective ambit of the Confrontation Clause and, by extension, *Bruton*."); *Thomas v. United States*, 978 A.2d 1211, 1224-25 (D.C. 2009) (concluding that where "a defendant's extrajudicial statement inculpating a co-defendant is *not* testimonial, *Bruton* does not apply, because admission . . . would not infringe the co-defendant's Sixth Amendment rights").

We join these courts and hold that when an out-of-court statement made by a nontestifying codefendant is nontestimonial, *Bruton* is inapplicable because such statements are outside the scope of the confrontation clause.

### D. Nollette's Statement Is Nontestimonial and, Therefore outside the Scope of the Confrontation Clause

Applying this harmonized rule in this case, we first determine whether the out-of-court statements were testimonial. If they *were*, we proceed to a confrontation clause analysis. If not, the confrontation clause does not apply. As the United States Supreme Court has explained, a statement is "testimonial" if it is the functional equivalent of in-court testimony. *See Crawford*, 541 U.S. at 51-52. A testimonial

statement is designed to establish or prove some past fact, or is essentially a weaker substitute for live testimony at trial. *Davis*, 547 U.S. at 827-28. Where the statement is effectively a substitute for live trial testimony, the statement is testimonial. *Id.* at 828. *Crawford* listed some examples such as "'*ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially.'" 541 U.S. at 51. "Statements taken by police officers in the course of interrogations," which was the case in *Crawford*, are also testimonial. *Id.* at 52. However, a "casual remark to an acquaintance" is not testimonial. *Id.* at 51.

Here, Nollette's statements to Solem were nontestimonial. Nollette's statements were that he and a friend had discussed burgling Lancer Lanes and that his friend had called him while burgling Lancer Lanes. The statements were not designed to establish or prove some past fact, nor were they a weaker substitute for live testimony at trial; rather, Nollette was casually confiding in a friend. Nollette would not have reasonably expected that statement to his friend to be used prosecutorially. Those statements were merely "casual remark[s] to an acquaintance." *Id.* Therefore, the statements were nontestimonial. Since they were nontestimonial, they were

outside the scope of the confrontation clause. Therefore, Wilcoxon suffered no confrontation violation.[3]

2. *Even If Wilcoxon's Confrontation Right Had Been Violated, It Would Have Been Harmless Error*

Although we conclude that Wilcoxon's confrontation right was not violated and no error occurred by admitting Nollette's statement, we note that even if his right had been violated, the outcome would remain the same because, in the context of all of the evidence presented at trial, the admitted statements did not contribute to Wilcoxon's conviction.

Confrontation clause errors are subject to a harmless-error analysis as laid out in *Chapman v. California*, 386 U.S. 18, 22-24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986). Under *Chapman*, before a constitutional error can be harmless, the State must show "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." 386 U.S. at 24.

> Whether such an error is harmless in a particular case depends upon a host of factors, . . . includ[ing] the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness

---

[3] Wilcoxon also argues that the trial court committed reversible error by failing to provide the jury a limiting instruction regarding the out-of-court statement sua sponte. Wilcoxon contends that such an instruction was necessary to avoid harming his confrontation right. However, because we hold that the statement was outside the scope of the confrontation clause, no limiting instruction was necessary.

on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

*Van Arsdall*, 475 U.S. at 684.

Here, Nollette's statements were unimportant to the State's case when compared with Wilcoxon's own admissions. Wilcoxon bragged to his friend Eric Bomar that he burgled Lancer Lanes, and Bomar testified as to Wilcoxon's description of the burglary at trial. This description was corroborated by the surveillance video of the burglary.

The nontestimonial statements at issue merely corroborated the cell phone calls that Wilcoxon made to Nollette during the time of the burglary. However, these calls were already circumstantially corroborated by the surveillance video and the cell phone records. Therefore, the statements were unimportant to the State's overall case. It is clear from the record that the admission of Nollette's statements did not alter the outcome of the State's case against Wilcoxon. Therefore, any feared error was harmless beyond a reasonable doubt.

## CONCLUSION

In accordance with the United States Supreme Court's holdings in *Crawford* and *Davis*, we conclude that the confrontation clause is limited to testimonial statements, even in the context of nontestifying codefendants. Since the statements in this case were not testimonial, the confrontation clause did not apply and thus was not violated. Consequently, we affirm Wilcoxon's conviction.

WE CONCUR:

No. 91331-5

GONZÁLEZ, J. (concurring)—I agree with the lead opinion that *Bruton*[1] and the confrontation clause did not apply to the out-of-court statements at issue before us. A threshold question in determining when the confrontation clause applies is whether the out-of-court statement was procured by the government. We should treat statements that were not procured by the government as presumptively nontestimonial. Thus, their admissibility should be governed by the rules of evidence, not the confrontation clause.

In *Crawford*, the United States Supreme Court noted that the confrontation clause applies to "'witnesses' against the accused—in other words, those who 'bear testimony.'" *Crawford v. Washington*, 541 U.S. 36, 51, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004) (quoting 2 NOAH WEBSTER, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828)). "An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." *Id.* The Supreme Court further explained the label "testimonial" "applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id.*

---

[1] *Bruton v. United States*, 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968).

1

at 68. When the primary purpose of the government procured statement is to establish or prove past events potentially related to a criminal prosecution, the statement is testimonial and subject to a confrontation clause analysis. *See, e.g.*, *Davis v. Washington*, 547 U.S. 813, 822, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006).

On the other hand, statements not procured by the government bear "little resemblance to the civil-law abuses the Confrontation Clause targeted." *Crawford*, 541 U.S. at 51. These statements are "less likely to be testimonial" than statements made to the government for the primary purpose of aiding a potential criminal prosecution. *Ohio v. Clark*, ___ U.S. ___, 135 S. Ct. 2173, 2182, 192 L. Ed. 2d 306 (2015). I would hold that a statement that is not procured by the government is presumptively not testimonial. Aside from explicitly testimonial contexts, absent some evidence showing that a statement was given or procured as evidence to be used in a later criminal prosecution, the confrontation clause should presumptively not apply. If the confrontation clause does not apply, then the admissibility of those statements is governed by traditional rules of evidence. *Michigan v. Bryant*, 562 U.S. 344, 359, 131 S. Ct. 1143, 179 L. Ed. 2d 93 (2011); *see Davis*, 547 U.S. at 821.

The statements at issue in this case were not procured by the government as they were merely "casual remark[s] to an acquaintance." *Crawford*, 541 U.S. at

51. The statements are presumptively nontestimonial, and there was no evidence at the time the statements were made to suggest that they would be used in a later criminal prosecution. The confrontation clause does not apply. Accordingly, I concur.

González, J.

Fairhurst, J.

*State v. Wilcoxon (Troy J.)*

No. 91331-5

MADSEN, C.J. (dissenting)—I disagree with the lead opinion's conclusion that *Bruton*[1] does not apply where nontestimonial statements are involved. *Crawford*[2] and *Davis*[3] address whether admitting certain evidence violates the defendant's right of confrontation. *Bruton* and its progeny address a different concern—the prejudicial effect of inadmissible evidence, heard or seen by the jury, in a joint trial. Based on these fundamentally different purposes, I believe the *Bruton* doctrine continues to apply, even to nontestimonial statements.

As an initial matter, it is important to recall that this case is not about whether James Nollette's confession implicating Troy Wilcoxon should have been *admitted* against Wilcoxon as substantive evidence. Rather, it is about whether Nollette's confession implicating Wilcoxon, which the trial court ruled was inadmissible against Wilcoxon, should have been heard by the jury in a joint trial. This is the focus of *Bruton*—that a defendant's confrontation clause rights are violated when the jury hears codefendant statements, inadmissible against the defendant, but that nonetheless

---
[1] *Bruton v. United States*, 391 U.S. 123, 137, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968).
[2] *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).
[3] *Davis v. Washington*, 547 U.S. 813, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006).

implicate him, because the prejudice is so great that a limiting instruction is not enough to cure it. U.S. CONST. amend. VI.

I would hold that *Bruton* survives *Crawford* and applies to both testimonial and nontestimonial statements, that Nollette's statement of "friend" implicates Wilcoxon so as to invoke *Bruton*'s protections, and that this constitutional error was not harmless. I would vacate Wilcoxon's conviction.

## DISCUSSION

### I

In *Bruton*, the Supreme Court held that a codefendant's statement—inadmissible against Bruton—that the jury heard and for which the judge gave a limiting instruction, violated Bruton's confrontation clause rights. 391 U.S. at 126. The factors the Court "deemed relevant in this area [were] the likelihood that the instruction will be disregarded, the probability that such disregard will have a devastating effect, and the determinability of these facts in advance of trial." *Cruz v. New York*, 481 U.S. 186, 193, 107 S. Ct. 1714, 95 L. Ed. 2d 162 (1987) (internal citations omitted). These factors are different from the concerns of *Crawford* and *Davis*, which instead focused on the reliability of hearsay evidence deemed admissible against the defendant.

To understand the different harms addressed under the confrontation clause, the historical underpinnings of *Bruton* and *Crawford* are helpful. The *Bruton* doctrine developed to address the harmful effect of putting evidence, inadmissible against a

2

codefendant, before the jury in a joint trial, while *Roberts*,[4] *Crawford*, and *Davis* deal

with the proper means of assessing reliability in determining what evidence may be

admitted directly against the defendant without violating the confrontation clause.

*Bruton* finds its beginnings in *Delli Paoli v. United States*, 352 U.S. 232, 77 S. Ct.

294. 1 L. Ed. 2d 278 (1957), *overruled by Bruton*, 391 U.S. 123. *Delli Paoli* involved a

joint trial of five defendants; the confession of one defendant was properly admitted

against him as a statement against interest but was inadmissible against the other

defendants. *Id.* at 233. The trial judge gave an emphatic instruction to the jury to use the

confession only to determine the confessor's guilt. *Id.* The Supreme Court affirmed the

trial court, fearing that a contrary decision would undermine the trial-by-jury system.

The Court held that so long as a limiting instruction was given to the jury, the defendant

was protected and it was not reversible error. *Id.* at 242-43.

Justice Frankfurter, writing for three other justices, dissented. He acknowledged

that "[o]ne of the most recurring . . . difficulties [in a joint trial] pertains to incriminating

declarations by one or more of the defendants that are not admissible against others." *Id.*

at 247 (Frankfurter, J., dissenting). Justice Frankfurter identified the practical effect of

allowing an inadmissible statement to be put before the jury: the government receives

"the windfall of having the jury be influenced by evidence against a defendant which, as

a matter of law, they should not consider but which they cannot put out of their minds."

---

[4] *Ohio v. Roberts*, 448 U.S. 56, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980), *overruled by Crawford*, 541 U.S. at 68-69.

*Id.* at 248 (Frankfurter, J., dissenting). This prejudice could not be cured by a limiting instruction because such an instruction was "intrinsically ineffective in that the effect of such a nonadmissible declaration cannot be wiped from the brains of the jurors." *Id.* at 247 (Frankfurter, J., dissenting).

Building on Justice Frankfurter's dissent, a majority of the Court began to express concern with jurors' ability to disregard evidence, even when so instructed. In *Jackson v. Denno*, 378 U.S. 368, 371-74, 84 S. Ct. 1774, 12 L. Ed. 2d 908 (1964), a question was raised as to the voluntariness of the defendant's confession, which he gave at the hospital while on medication, awaiting surgery, after being shot in the lung and liver. The jury was instructed that it should disregard the confession if it found the confession involuntary and then decide the case based on the other evidence. *Id.* at 374-75. The *Jackson* Court was concerned whether, if the jury did find the confession involuntary, it could "then disregard the confession in accordance with its instructions" or whether "[i]f there [were] lingering doubts about the sufficiency of the other evidence, [would] the jury unconsciously lay them to rest by resort to the confession?" *Id.* at 388. Ultimately, the Court found that juries should not be trusted to disregard involuntary confessions because to do so would pose "substantial threats to a defendant's constitutional rights." *Id.* at 389.

*Bruton* expanded on the reasoning of *Jackson*. In *Bruton*, George Bruton and William Evans were tried jointly on the charge of bank robbery. 391 U.S. at 124. After the arrest, Evans gave a confession to a postal inspector stating that he and Bruton had committed the armed robbery. *Id.* Evans did not testify, but the trial court allowed the

4

prosecution to introduce the confession, along with a limiting instruction charging the jury that Evans' confession was inadmissible against Bruton and that they were "'not to consider it in any respect to the defendant Bruton, because insofar as he is concerned it is hearsay.'" *Id.* at 125 n.2. The Court reasoned this instruction was insufficient because "there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." *Id.* at 135. Bruton's joint trial presented such a context, "where the powerfully incriminating extrajudicial statements of a codefendant, who [stood] accused side-by-side with the defendant, [were] deliberately spread before the jury in a joint trial." *Id.* at 135-36. This prejudice is compounded by the fact that the alleged accomplice invokes his Fifth Amendment right not to testify and therefore cannot be cross-examined; "[i]t was against such threats to a fair trial that the Confrontation Clause was directed." *Id.* at 136. The Court went on to hold that "in the context of a joint trial we cannot accept limiting instructions as an adequate substitute for petitioner's constitutional right of cross-examination. The effect is the same as if there had been no instruction at all." *Id.* at 137. The focus of the *Bruton* Court was the constitutional harm to the defendant from a codefendant's statement, inadmissible against the defendant, being heard by the jury; it was not the reliability of a codefendant's statement or whether it was admissible against the defendant.

In 1980, a new line of confrontation clause jurisprudence began with *Ohio v. Roberts*. The *Roberts* Court did not deal with the harm caused by presenting a codefendant's statement in a joint trial. Instead, it was concerned with the reliability of hearsay admitted directly against the defendant and whether or not this violated the confrontation clause. The Court initiated the "adequate 'indicia of reliability'" test to determine whether or not a hearsay statement was admissible against a defendant. *Id.* at 66. Under *Roberts*, if a declarant's hearsay statements were admissible against a defendant under an exception to the hearsay rule and that declarant was not available for cross-examination, the statements were inadmissible unless the State proved (1) the declarant is unavailable and (2) the statement bore "adequate 'indicia of reliability.'" *Id.* Reliability may be established if the statement "falls within a firmly rooted hearsay exception" or bears "particularized guarantees of trustworthiness." *Id.* *Roberts*' importance to the present case is that it dealt with reliability when determining the admissibility of evidence under the confrontation clause, as opposed to *Bruton*, which dealt with the prejudice from inadmissible evidence.

*Lee v. Illinois*, 476 U.S. 530, 106 S. Ct. 2056, 90 L. Ed. 2d 514 (1986), highlights the distinction between *Bruton* and *Roberts* and the harm each case addresses. In *Lee*, Lee and her codefendant Thomas were tried jointly in a bench trial for a double murder. *Id.* at 531. Both defendants confessed, and those confessions were admitted at trial against the confessor. *Id.* at 536-37. Counsel for both defendants withdrew their motions for severance because they trusted the court would consider only the "evidence proper to

each defendant." *Id.* at 536. Instead, the "trial judge expressly relied on Thomas' confession and his version of the killings" in convicting Lee. *Id.* at 538. In overturning the conviction, the Supreme Court distinguished *Bruton*, stating, "We based our decision in *Bruton* on the fact that a confession that incriminates an accomplice is so 'inevitably suspect' and 'devastating' that the ordinarily sound assumption that a jury will be able to follow faithfully its instructions could not be applied." *Id.* at 542 (quoting *Bruton*, 391 U.S. at 136). Because Lee was tried to the bench, the Court said it was not "concerned with the effectiveness of limiting instructions in *preventing spill-over prejudice* to a defendant when his codefendant's confession is admitted against the codefendant at a joint trial" and thus found *Bruton* inapposite. *Id.* (emphasis added). Instead, the Court identified a different issue: whether, under *Roberts*, Thomas' confession bore adequate "indicia of reliability" such that it could be admitted directly against Lee[5] without violating her confrontation clause rights. The Court found the "indicia of reliability" lacking and held that the confession was inadmissible. *Id.* at 546.

The Court returned to its *Bruton* line of cases with *Richardson v. Marsh*, 481 U.S. 200, 107 S. Ct. 1702, 95 L. Ed. 2d 176 (1987). The *Marsh* Court held that *Bruton*'s protections are unnecessary when a codefendant's confession is redacted to "eliminate not only the defendant's name, but any reference to his or her existence" and a limiting instruction is given. *Id.* at 211. The court reiterated the harm against which *Bruton*

---

[5] The evidence technically was not admitted against Lee, but because the judge relied so heavily on it in convicting her, the Court treated it as a de facto admission of evidence.

protects when it stated that "while it may not always be simple for members of the jury to obey the instruction that they disregard an incriminating inference, there does not exist the overwhelming probability of their inability to do so that is the foundation of *Bruton*'s exception to the general rule." *Id.* at 208.

In the same year, the Court decided *Cruz*, overruling *Parker v. Randolph*, 442 U.S. 62, 99 S. Ct. 2132, 60 L. Ed. 2d 713 (1979). *Cruz*, 481 U.S. 186. *Cruz* held that "where a nontestifying codefendant confession incriminating the defendant is not directly admissible against the defendant, the Confrontation Clause bars its admission at their joint trial, even if the jury is instructed not to consider it against the defendant, and even if the defendant's own confession is admitted against him." *Id.* at 193 (citation omitted). Explaining why the interlocking nature of the confession was irrelevant to a *Bruton* analysis, *Cruz* further distinguished between harm and reliability in the two lines of confrontation clause case law. The Court found that

> what the "interlocking" nature of the codefendant's confession pertains to is not its *harmfulness* but rather its *reliability*: If it confirms essentially the same facts as the defendant's own confession it is more likely to be true. Its reliability, however, may be relevant to whether the confession should (despite the lack of opportunity for cross-examination) be *admitted as evidence* against the defendant, but cannot conceivably be relevant to whether, assuming it cannot be admitted, the jury is likely to obey the instruction to disregard it, or the jury's failure to obey is likely to be inconsequential. The law cannot command respect if such an inexplicable exception to a supposed constitutional imperative is adopted. Having decided *Bruton*, we must face the honest consequence of what it holds.

*Id.* at 192-93 (citations omitted). The honest consequence of *Bruton* is that hearsay that is *inadmissible against the defendant* under the rules of evidence, yet still put before the

jury, violates the confrontation clause in a joint jury trial because it is harmful. In contrast, *Roberts* declared that certain hearsay—admissible under a hearsay exception—nonetheless violates the confrontation clause because it is unreliable. Therefore, the interlocking nature of the codefendants' confessions—much like the interlocking nature of Nollette's and Wilcoxon's alleged confessions—was relevant to whether a codefendant's statement could be admitted against the defendant, but not relevant to the prejudice of putting an inadmissible statement before the jury in a joint trial. What *Cruz* makes clear is that the *Roberts* reliability test had no effect on the *Bruton* doctrine, which protects against harm.[6]

In 2004, the Court decided *Crawford*, which overruled *Roberts*. The Court abandoned the "adequate indicia of reliability" test and held that in order to admit an out-of-court testimonial statement, the person against whom it is admitted must have had the opportunity to cross-examine the declarant. *Crawford*, 541 U.S. at 68-69. Central to the decision was the meaning of "witnesses against." *Id.* at 42-43. Citing the history of the confrontation clause, the Court found that to witness against someone is to "'bear testimony.'" *Id.* at 51 (quoting 2 NOAH WEBSTER, AN AMERICAN DICTIONARY OF THE

---

[6] The concurrence states "[i]f the confrontation clause does not apply, then the admissibility of those statements is governed by traditional rules of evidence." Concurrence at 2. This statement highlights the problem of trying to force *Bruton* through the lens of *Crawford* because how can the Rules of Evidence apply to evidence not offered against Wilcoxon, but that nonetheless results in spillover prejudice? For example, ER 403 would not bar the admission of Nollette's statements against Nollette because they were more prejudicial than probative to Wilcoxon. The Rules of Evidence would prevent the jury from hearing Nollette's statements only if Wilcoxon were tried separately.

ENGLISH LANGUAGE (1828)). While leaving a comprehensive definition of "testimony" for another day, it included at least "prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id.* at 68. The effect of *Crawford* was that if a statement offered against a defendant at trial was not testimonial, and no other evidentiary or procedural rule operated to exclude it, the confrontation clause would not bar its admission. *Id.*

Notably, *Crawford* did not address the confrontation clause as it related to the prejudice stemming from inadmissible evidence being put before the jury in a joint trial. In fact, in *Crawford*, which many courts hold limits *Bruton* only to testimonial statements, the Court explicitly acknowledged that *Crawford* and *Bruton* address different concerns. Referencing *Parker*, a *Bruton* case, the Court noted, "Our only precedent on interlocking confessions had *addressed the entirely different question* whether a limiting instruction cured prejudice to codefendants from admitting a defendant's *own* confession against him at trial." *Crawford*, 541 U.S. at 59 (first emphasis added). Although testimonial hearsay is the primary object of the confrontation clause, that is not its sole concern, and *Crawford* implicitly, if not explicitly, found the Sixth Amendment offers different protections. *Id.* at 53.

*Davis* further delineated the testimonial/nontestimonial dichotomy, holding that statements made to police officers "under circumstances objectively indicating that the primary purpose" is to assist officers in meeting an ongoing emergency are nontestimonial. 547 U.S. at 822. On the other hand, statements given under

10

circumstances that indicate "that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution" are testimonial. *Id.* Finally, in *Whorton v. Bockting*, the Court stated that "[u]nder *Crawford* . . . the Confrontation Clause has no application to [nontestimonial] statements and therefore *permits their admission even if they lack indicia of reliability.*" 549 U.S. 406, 420, 127 S. Ct. 1173, 167 L. Ed. 2d 1 (2007) (emphasis added). *Whorton* reaffirms that *Roberts*, *Crawford*, and *Davis* dealt with admissibility and reliability, not harmfulness.

In summary, under *Crawford*, a codefendant's nontestimonial confession, which the trial court properly determines is *admissible against the defendant*, will not be barred by the confrontation clause. However, if the trial court rules that the nontestifying codefendant's nontestimonial confession, which implicates the defendant, is *inadmissible against the defendant*, *Bruton* dictates that the confession either not be introduced or be redacted to eliminate even the existence of an accomplice, or that a severance be granted. *Gray v. Maryland*, 523 U.S. 185, 192, 118 S. Ct. 1151, 140 L. Ed. 2d 294 (1998). As one court summarized,

> *Crawford* ensures the procedural guarantee of the Confrontation Clause by requiring that the reliability of testimonial hearsay presented *against the defendant* be assessed in a particular manner, *i.e.*, by testing in the crucible of cross-examination. *Bruton*, and its progeny, on the other hand, act to neutralize the incriminating *effect* on the defendant of properly admitted confessions from a non-testifying co-defendant presented *against the co-defendant* at a joint trial.

*Commonwealth v. Whitaker*, 878 A.2d 914, 922 (Pa. Super. Ct. 2005) (citation omitted).

11

Following the trend that *Bruton* does not apply to nontestimonial statements, the lead opinion finds company. But nowhere in *Crawford, Davis*, or *Whorton* did the Court even mention *Bruton*, let alone overrule it. Because *Bruton* and *Crawford* address different harms, I would decline to follow the siren call.

I recognize it is both easy and tempting to decide that *Bruton* applies only if the statement at issue is testimonial. However, I find such a result untenable under the case law through which *Bruton* and *Crawford* evolved. It is contrary to *Bruton*'s original intent: to prevent the prejudice—incurable by a limiting instruction—that occurs when the jury hears an incriminating confession or statement, properly admitted against the codefendant yet inadmissible against the defendant, in a joint trial. If Nollette and Wilcoxon had been tried separately, it would have been error for the trial judge to allow the prosecutor to introduce Nollette's inadmissible confession at Wilcoxon's trial. Evidence that would be inadmissible in a severed trial should not be put before the jury in a joint trial solely because the confrontation clause would not bar its admission against the defendant under a hearsay exception. The lead opinion's holding circumvents *Bruton*'s protections and makes manifest Justice Frankfurter's concern that the prosecution receives the windfall of having inadmissible evidence against the defendant heard by the jury.

In this case, the question is not whether Nollette's statements are admissible against Nollette—or Wilcoxon—which *Crawford* would answer. Rather, here we must answer "the entirely different question" of how to "cure[] prejudice to codefendants from

12

admitting a defendant's *own* confession against him in a joint trial." *Crawford*, 541 U.S. at 59. The answer is nothing new: the trial court must either not allow the statements at all, redact them to eliminate all reference to the defendant, or grant a severance.

The "primary object" of the Sixth Amendment to the federal constitution is testimonial hearsay, but that is not its sole concern. *Id.* at 53. It is not a static, solitary clause. The confrontation clause is "multifaceted enough to support an independent justification for the continued vitality of Bruton and its progeny." 30B CHARLES WRIGHT & ARTHUR MILLER, FEDERAL PRACTICE & PROCEDURE § 7034.1 n.5, at 500-01 (2011 ed.). Forcing *Bruton* through the lens of *Crawford* renders the constitutional protections of *Bruton* irrelevant; it places Fifth Amendment protections over Sixth Amendment protections. U.S. CONST. amends V, VI. Saying that *Bruton* applies only to testimonial statements leads us to two equally unacceptable conclusions: either it is an implicit admission that whether the jury hears inadmissible evidence in a joint trial no longer matters, or it stands for the proposition that *Crawford*'s transition to the testimonial/nontestimonial dichotomy for confrontation clause purposes has somehow granted juries the ability to effectively ignore inadmissible evidence—regardless of whether it is testimonial or not—when deciding the guilt or innocence of the defendant. These I cannot accept. Therefore, I conclude that the introduction of nontestimonial codefendant statements in a joint trial, admissible only against the codefendant and that

13

implicate the defendant, violates the defendant's confrontation clause rights and *Bruton* applies.[7]

Because I would hold that *Bruton* applies to nontestimonial statements, it is necessary to answer whether Nollette's statements implicated Wilcoxon, and whether that error was harmless.

## II

The protections of *Bruton* are triggered where the codefendant's statements facially incriminate the defendant. *Marsh*, 481 U.S. at 211. If *Bruton* applies and a violation occurs, that constitutional error is subject to a harmless-error analysis. *Harrington v. California*, 395 U.S. 250, 254, 89 S. Ct. 1726, 23 L. Ed. 2d 284 (1969). Therefore, I must answer the question of whether Nollette's reference to his "friend" in his confession implicates Wilcoxon. If it does not, then there was no constitutional error. If "friend" does implicate Wilcoxon, then it is necessary to determine whether or not the error was harmless. Because "friend" is an obvious reference to Wilcoxon, and because the remaining untainted evidence was not overwhelming as to guilt, I would hold the error was not harmless.

In addressing whether "friend" implicates Wilcoxon, *Marsh* and *Gray* guide my analysis. In *Marsh*, the Supreme Court addressed the issue of whether a redacted confession that does not actually name the defendant is incriminating for purposes of

---

[7] Due process offers another avenue through which to enforce *Bruton*; however, given the case law and the different protections afforded, the confrontation clause is still an appropriate means to ensure *Bruton*'s protections.

*Bruton.* 481 U.S. at 203. The case involved a joint murder trial of petitioner Marsh and her codefendant, Williams. The trial court admitted the confession of Williams against him, but redacted it to "'omit all reference' to his codefendant, Marsh—'indeed, to omit all indication that anyone other than . . . Williams' and a [named] third person had 'participated in the crime.'" *Gray*, 523 U.S. at 190-91 (first alteration in original) (quoting *Marsh*, 481 U.S. at 201). The Court held that "admission of a nontestifying codefendant's confession with a proper limiting instruction" that was "redacted to eliminate not only the defendant's name, but any reference to his or her existence" did not implicate Bruton and thus did not violate the confrontation clause. *Marsh*, 481 U.S. at 211.

The Court revisited the issue in *Gray* and further refined the parameters of *Bruton*'s reach. In *Gray*, the confession at issue substituted blanks or the word "deleted" for defendant Gray's name. 523 U.S. at 188. The Court held that this "so closely resemble[d] *Bruton*'s unredacted statements" that it fell within *Bruton*'s protective rule. *Id.* at 192. Finding that the jury will "often realize that the confession refers specifically to the defendant," the Court reasoned:

> A juror somewhat familiar with criminal law would know immediately that the blank, in the phrase "I, Bob Smith, along with , robbed the bank," refers to defendant Jones. A juror who does not know the law and who therefore wonders to whom the blank might refer need only lift his eyes to Jones, sitting at counsel table, to find what will seem the obvious answer, at least if the juror hears the judge's instruction not to consider the confession as evidence against Jones, for that instruction will provide an obvious reason for the blank. A more sophisticated juror, wondering if the blank refers to someone else, might also wonder how, if it did, the prosecutor

15

could argue the confession is reliable, for the prosecutor, after all, has been arguing that Jones, not someone else, helped Smith commit the crime.

*Id.* at 193. Although the Court conceded some inference would be necessary to connect the redacted confession with the defendant, it stated that "inference pure and simple cannot make the critical difference . . ." and that "[*Marsh*] must depend in significant part upon the *kind* of, not the simple *fact* of, inference." *Id.* at 195-96. The Court went on to hold that the inferences at issue involve statements that "despite redaction, obviously refer to someone, often obviously the defendant, and which involve inferences a jury ordinarily could make immediately, even were the confession the very first item introduced at trial." *Id.* at 196.

*Marsh* and *Gray* left open the question of whether the use of neutral pronouns may be used instead of a blank space or the word "deleted" and still satisfy *Bruton*. In *Marsh*, the Court "express[ed] no opinion on the admissibility of a confession in which the defendant's name has been replaced with a symbol or neutral pronoun." 481 U.S. at 211 n.5. Later, dicta in *Gray* mused about whether neutral pronouns might be substituted when the majority wondered why the confession could not have been altered to read, "Me,  ,  and a few other guys." *Gray*, 523 U.S. at 192.

Neither the Supreme Court nor this court have addressed this scenario, but our Court of Appeals has. In *State v. Medina*, 112 Wn. App. 40, 51, 48 P.3d 1005 (2002), the court affirmed the admission of the codefendant's statement because the redactions were so varied ("'other guys,'" "'the guy,'" "'one guy,'" and "'they'") among six possible accomplices that it was impossible to clearly infer that one codefendant's statement

16

referred to either the appellant or the other codefendant. In contrast, in a joint trial of three defendants, where the State introduced two codefendants' confessions admitting that "we" saw a good service station to rob, "we" pulled around the corner, and "we" got out of the car, the court held that it was improper to admit the statements against the third codefendant because a jury could "readily conclude that [the defendant] was included in the 'we's' of the codefendants' statements." *State v. Vannoy*, 25 Wn. App. 464, 473-75, 610 P.2d 380 (1980). Similarly, the Court of Appeals has rejected the use of an "other guy" redaction where only two accomplices committed the crime and only two defendants were on trial. *State v. Vincent*, 131 Wn. App. 147, 154, 120 P.3d 120 (2005). Finally, in *State v. Fisher*, 184 Wn. App. 766, 770, 774-76, 338 P.3d 897 (2014), *review granted*, 183 Wn.2d 1024, 355 P.3d 1153 (2015), the court found that changing the defendant's name to "'the first guy'" was an insufficient redaction under *Bruton* because the only reasonable inference the jury could have drawn is that the defendant was "the first guy." It is clear from our lower courts' interpretation of *Marsh* and *Gray* that what is important is not the form the redaction takes, but rather whether it obviously refers to the defendant.[8]

---

[8] Circuit courts, on the other hand, have interpreted *Gray* such that the use of a neutral pronoun in lieu of a redaction satisfies *Bruton*. For example, the Sixth Circuit, in *United States v. Winston*, acknowledged that "several of our sister circuits have noted that a *Bruton* violation can be avoided by replacing the co-defendant's name with a neutral pronoun or other generalized phrase." 55 F. App'x 289, 294 (6th Cir. 2003). I would decline to adopt the bright line rule of some circuit courts that a neutral pronoun always satisfies *Bruton*, and hold that whatever the form of the redaction, it must be clear that the redaction does not obviously refer to the defendant.

17

Applying that rule to this case, the State's theory was that only two people committed this crime. Even though Nollette's use of the word "friend" is not an obvious redaction and does not implicate Wilcoxon by name, it obviously refers to him, and therefore falls within the category of redactions or substitutions forbidden by *Bruton*. The only inference necessary would be for the juror to look over at Mr. Wilcoxon sitting at counsel table. It is an obvious, immediate inference of the kind described in *Gray*, 523 U.S. at 193. For if "friend" referred to someone else, and the State's position was that only two people committed this crime, then for what other reason would Wilcoxon be on trial if he was not the "friend" being referenced?[9] At oral argument, in reference to whether "friend" implicated Mr. Wilcoxon, counsel for the State conceded that "given the fact that there are only two defendants on trial, perhaps the jury would naturally assume that the statement did refer to Mr. Wilcoxon." Wash. Supreme Court oral argument, *State v. Wilcoxon*, No. 91131-5 (Sept. 10, 2015), at 20 min., 3 sec., *audio recording by* TVW, Washington State's Public Affairs Network, http://www.tvw.org. Given the standard set forth by *Marsh* and *Gray*, Nollette's confession that he and a "friend" had robbed the casino implicates Wilcoxon and falls within the scope of *Bruton*.

The admission of Nollette's statements during his joint trial with Wilcoxon amounted to constitutional error. It is now necessary to determine whether or not that error was harmless.

---

[9] Even if the jury did not know the State's position, Nollette's confession only implicates himself and Wilcoxon. The natural result of that is that even if the confession were the first piece of evidence presented at trial, the jury would know it referred to Wilcoxon.

18

I disagree with the lead opinion's conclusion that even if there were a Sixth Amendment violation, "any feared error was harmless beyond a reasonable doubt." Lead opinion at 15. A constitutional error is presumed to be prejudicial, and the State bears the burden of proving harmless error. *State v. Guloy*, 104 Wn.2d 412, 425, 705 P.2d 1182 (1985). "[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967); *see also State v. Watt*, 160 Wn.2d 626, 635, 160 P.3d 640 (2007) ("A constitutional error is harmless if the appellate court is convinced beyond a reasonable doubt that any reasonable jury would have reached the same result in the absence of the error." (citing *Guloy*, 104 Wn.2d at 425)). The test is whether the untainted evidence is so overwhelming that it necessarily leads to a finding of guilt. *State v. Lui*, 179 Wn.2d 457, 495, 315 P.3d 493, *cert. denied*, 134 S. Ct. 2842 (2014). Under that test, "a conviction will be reversed where there is any reasonable possibility that the use of inadmissible evidence was necessary to reach a guilty verdict." *Guloy*, 104 Wn.2d at 426. Nollette's confession was necessary to reach a guilty verdict; the remaining untainted evidence was not so overwhelming that his conviction was inevitable.

This court first adopted the "'overwhelming untainted evidence'" test in *Guloy*, because that test allows appellate courts to avoid reversal based on a technicality while still ensuring a conviction will be reversed if the improper evidence was necessary to convict. *Id.* In *Guloy*, the admission of two out-of-court statements by a subsequently

arrested suspect violated the codefendants' confrontation clause rights. *Id.* at 424-25. This court held the error harmless because the remaining untainted evidence consisted of (1) testimony from a witness who observed the defendants leaving the scene of the murder and (2) the dying declaration of one of the victims identifying the defendants as his attackers. *Id.* at 415, 426.

The following year, in *State v. Hieb*, 107 Wn.2d 97, 109-10, 727 P.2d 239 (1986), we reaffirmed our adherence to the "overwhelming untainted evidence" test. The defendant, Hieb, was convicted of the murder of his girlfriend's 20-month-old daughter. *Id.* at 98. Without deciding the confrontation clause issue presented, this court held that any error was harmless. *Id.* at 111-12. Even excluding the potentially tainted evidence, the untainted evidence included (1) testimony of medical examiners regarding numerous injuries sustained in the three months prior to her death—injuries which could not be self-inflicted by a 20-month-old child, (2) statements from the victim's older sister that Hieb had hit the child in the stomach and put a pillow over her face, (3) dents and blood on the apartment walls, and (4) the neighbor's testimony that four days before her death, when Hieb was alone with the girls, they heard what sounded like doors slamming for 45 minutes. *Id.* at 110-11.

In *Watt*, 160 Wn.2d at 637, this court held a confrontation clause violation was harmless error because the untainted evidence satisfied our harmless error test. Defendant Watt challenged her conviction for manufacture of methamphetamine, possession of methamphetamine, and second degree criminal mistreatment. *Id.* at 628.

The State improperly introduced her codefendant husband's statements that he had made anhydrous ammonia and that he had made methamphetamine while the children were on the property. *Id.* at 630. However, the remaining untainted evidence included (1) methamphetamine in Watt's wallet and bedroom, (2) extensive evidence of a methamphetamine lab in the garage, (3) testimony from the defendant's stepdaughter that she lived on the property and Watt sometimes went into the garage, and (4) testimony from a paint store employee that Watt purchased five gallons of toluene—a key ingredient for making methamphetamine—amounting to a two-year supply for a professional painter. *Id.* at 637-38.

In *State v. Anderson*, 171 Wn.2d 764, 766, 254 P.3d 815 (2011), the defendant was tried for child molestation. Testimony of another alleged victim of the defendant was introduced through a nurse practitioner who had examined him. The State conceded that the statements were testimonial and the issue was whether it was harmless error. *Id.* at 769-70. The remaining untainted evidence consisted of (1) unrefuted testimony by the victim of the molestation, which was corroborated by a counselor to whom the molestation was disclosed and a police detective, and (2) the defendant's statements that he had molested a different child on at least two prior occasions. *Id.* at 770. In light of the overwhelming evidence, this court found the error harmless. *Id.*

Finally, in *Lui*, 179 Wn.2d at 494-95, we found a confrontation clause violation in the admission of a toxicology report and statements taken from an autopsy. Again we held the error was harmless. *Id.* at 497. The toxicology report was irrelevant as to the

21

charges against the defendant, and the statements taken from the autopsy report were largely corroborated by properly admitted evidence. *Id.* at 496-97. Furthermore, the remaining "untainted evidence necessarily led to a finding of guilt." *Id.* at 497. A sampling of the remaining evidence included (1) DNA evidence linking the defendant to the murder, (2) evidence that a bloodhound led investigators directly to the defendant, (3) numerous inconsistencies in the testimony of the defendant, detracting from his credibility, and (4) "evidence suggesting that [the victim] had died before she could dress or put on her customary makeup; evidence suggesting that [she] had been dressed and her bags packed by 'somebody who doesn't know anything about women.'" *Id.*

In addition to this court's harmless error jurisprudence, a look back at *Harrington*, 395 U.S. at 254, the case in which the Supreme Court first applied the harmless error analysis to a *Bruton* violation, is helpful. In *Harrington*, four men were tried jointly for attempted robbery and first degree murder. Two codefendant confessions implicating Harrington were admitted against the codefendants. *Id.* at 252. Finding a *Bruton* violation, the Court went on to examine whether the error was harmless beyond a reasonable doubt. The untainted evidence included (1) petitioner's own statements placing him at the scene of the crime, admitting that one of the codefendants was the trigger man, that he fled with the other codefendants, and that he dyed his hair and shaved his mustache after the murder, (2) testimony of several eye witnesses placing him at the scene of the crime, and (3) testimony of one defendant who took the stand, placing Harrington in the store with a gun at the time of the robbery and murder. *Id.* at 252-53.

22

The Court found the inadmissible confessions cumulative and the remaining untainted evidence so overwhelming that to call it harmless error would be to say that any *Bruton* violation is per se error. *Id.* at 254.

These cases illustrate the type and strength of the remaining untainted evidence necessary to find harmless error. The untainted evidence here rises nowhere near this level.

In making a harmless error determination, we will review the entire record. *United States v. Hasting*, 461 U.S. 499, 509, 103 S. Ct. 1974, 76 L. Ed. 2d 96 (1983). The trial transcript reveals that—contrary to the majority's conclusion—Gary Solem's testimony (Nollette's confession) was vital to the State's case.[10] During direct examination of Solem, the State repeatedly elicited testimony regarding what Nollette told him about his "friend." The prosecutor led Solem's testimony back to the "friend" no less than eight times. B Verbatim Report of Proceeding (VRP) at 303-07, 312 (Jan. 8, 2014). In closing argument, the State relied heavily on Solem's testimony regarding the "friend." *See, e.g.,* D VRP at 687 (Jan. 10, 2014) ("When his friend asked him, what—what place would you hit? He not only recommended a casino, he recommended [Lancer Lanes]."), 690 ("[I]sn't it interesting that [Eric Bomar] comes into nearly $15,000, and isn't that the number that Mr. Nollette specifically mentioned to Mr. Solem when he was saying that his friend owed a guy money and he stated it was $15,000?"), 689

---

[10] Although we look only to the untainted evidence to determine whether any jury would find the defendant guilty beyond a reasonable doubt, the inadmissible evidence is still important insofar as how it would have affected the remaining untainted evidence at trial.

("[R]emember, he told Mr. Solem, my friend committed the burglary, he called me while the burglary was being committed."). In the State's rebuttal closing argument, when referring to Solem's testimony, the prosecutor argued, "And the big thing: only one person called Mr. Nollette. Mr. Nollette said he got a call from the burglar during the commission of the crime. There's only one person that called Mr. Nollette during the time of the burglary." *Id.* at 734. The State repeatedly hammered home the point that Solem testified that Nollette said he received a phone call from his friend. *See, e.g., id.* at 744 ("he gets a call from his friend saying, hey, dude, I'm in [Lancer Lanes] and I'm doing it"; "He tells [Solem] I got a call from my friend while he was committing the burglary."); *see also id.* at 732, 736, 742. It is clear that Solem's testimony greatly strengthened the State's case.

The lead opinion concludes beyond a reasonable doubt that any jury would have convicted Wilcoxon based on two pieces of evidence: Wilcoxon's statements to Bomar, and the circumstantial corroboration of the call log between Wilcoxon and Nollette by the surveillance video. Lead opinion at 15.

The first piece of evidence the lead opinion cites is Bomar's testimony that Wilcoxon "bragged [to him] that he burgled Lancer Lanes" and described the burglary. *Id.* However, contrary to the lead opinion's assertions, there is nothing in Bomar's testimony about Wilcoxon "bragging" about the burglary:

> Q. Do you, ah—do you recall—ah, can you state whether or not you recall him saying, ah—he used the words "pulled it off"?
> A. Ah, it was—honestly, not exactly, but it was something to that effect.

....

Q. Can you state whether or not you told [Sergeant Richard Muszynski], ah, that [Wilcoxon] said, "We pulled it off"?

....

A. Ah, honestly, I'm not sure the exact verbiage. It was I or we. Ah—
Q. —Do you—can you state whether or not you recall him using the—the—the term "Lancer thing"?
A. I believe that was used, yes.

C VRP at 505 (Jan. 9, 2014).

As to Bomar's recounting of Wilcoxon's description of the burglary, it is minimal at best:

Q. Had you ever heard Mr. Wilcoxon and Mr. Nollette discuss, ah, the Lancer Casino and how easy it would be to—to break into and—and steal the money?
A. Yes.
Q. Okay. Did they talk about, ah—what did they talk about about that?
A. Ah, the same as everyone else. Just, ah, that there wasn't much security and that it would be fairly simple to do.
....
Q. Did Mr. Wilcoxon describe how he got into the building?
A. Ah, something about the backdoor and security cameras.
Q. And what about the security cameras?
A. Ah, that they were killed.
Q. Okay. Did he indicate how he killed the security cameras?
A. Ah, not really. Ah, down—like going downstairs or something like that.
Q. Did he say, ah, what he did then?
A. Ah—ah, went to the cage and got the money.
Q. Did he say how he got into the cage?
A. Ah, as far as I recollect, ah, there were keys involved.
Q. Did he say how much was taken?
A. No.

*Id.* at 506-07. Perhaps more importantly, Bomar's testimony is inherently suspect. In addition to numerous inconsistencies, Bomar was the one initially under scrutiny from law enforcement, and he was the one who deposited $15,000 in his bank account in the

25

days following the robbery.[11] In his first interview with investigators, he denied knowing anything about the robbery. Then, after the recorder was turned off, he was told that if he did not cooperate, charges would be filed against him and he could go to jail. On cross-examination, Bomar testified that he was threatened to say what the investigators were asking him to say. This was confirmed on redirect examination:

> Q. [I]sn't it true that they told you that they didn't have any interest in charging you, they just wanted you to be honest?
> A. Ah, that is incorrect. I was made very aware of the possible charges that could come against me.

*Id.* at 541.

Bomar's testimony is the strongest evidence that Wilcoxon committed the crime. However, I cannot say that the inconsistent testimony of an initial suspect, given under threat of being prosecuted himself, and guided by the State's leading questions, would lead any jury to necessarily find Wilcoxon guilty beyond a reasonable doubt. Moreover, the defense elicited testimony regarding evidence of three other suspects who may have been the burglar captured on the surveillance footage. It is Nollette's confession implicating Wilcoxon that gives strength to Bomar's testimony.

The second piece of evidence on which the lead opinion relies is the call log between Wilcoxon and Nollette. The lead opinion says that Nollette's statements to Solem "merely corroborated the cell phone calls that Wilcoxon made to Nollette during the time of the burglary." Lead opinion at 15. "[T]hese calls were already

---

[11] Even the State's own money laundering expert could not determine where the $15,000 Bomar deposited came from.

circumstantially corroborated by the surveillance video and the cell phone records." *Id.*
This too, is not supported by the record. Sergeant Muszynski testified that three phone
calls between Wilcoxon and Nollette took place during the burglary: one at 1:59:54 a.m.
lasting 84 seconds, one at 2:07 a.m. lasting 69 seconds, and one at 2:08 a.m. lasting 74
seconds. That is almost four minutes of call time, one-third of the total time the suspect
was in the casino. Sergeant Muszynski also testified to the three surveillance cameras
that recorded the burglary. At no point during the burglary is the suspect seen holding or
speaking on a cell phone. Only Nollette's improperly admitted statements combined with
the cell phone records allow the jury to conclude that the man behind the garbage bag—
who the surveillance video never shows talking on a phone—was Wilcoxon.

Unlike the remaining untainted evidence in *Guloy*, *Hieb*, *Watt*, *Anderson*, *Lui*, and
*Harrington*, we do not have such "overwhelming untainted evidence" here. Without
Nollette's confession, the State's case against Wilcoxon is "woven from circumstantial
evidence." *Harrington*, 395 U.S. at 254. Nollette's confession adds credibility to
Bomar's testimony and strengthens the fabric of the remaining circumstantial evidence.
As the lead opinion points out, "before a constitutional error can be harmless, the State
must show 'beyond a reasonable doubt that the error complained of did not contribute to
the verdict obtained.'" Lead opinion at 14 (quoting *Chapman*, 386 U.S. at 24).
Admittedly, there is some evidence remaining against Wilcoxon. However, the test is not
that of "some" evidence of guilt, or even "a lot" of evidence of guilt, it must be
"overwhelming." Anything less than overwhelming evidence of guilt runs the risk of

27

invading the province of the jury, a concern we articulated in *State v. Robinson*, 24 Wn.2d 909, 917, 167 P.2d 986 (1946):

> Jurors and courts are made up of human beings, whose condition of mind cannot be ascertained by other human beings. Therefore, it is impossible for courts to contemplate the probabilities any evidence may have upon the minds of the jurors. The state attempts to safeguard the life and liberty of its citizens by securing to them certain legal rights. These rights should be impartially preserved. They cannot be impartially preserved if the appellate courts make of themselves a second jury and then pass upon the facts.

Although the lead opinion claims, "Nollette's statements were unimportant to the State's case," lead opinion at 15, that is simply not true. I would conclude that the admission of Nollette's statements, in violation of *Bruton* and the confrontation clause, was not harmless error.

CONCLUSION

*Bruton* and *Crawford* address different concerns under the confrontation clause. *Bruton* addresses the prejudice of having inadmissible codefendant statements put before a jury in a joint trial. *Crawford*, on the other hand, addresses the proper means for assessing the reliability of evidence admitted directly against a defendant. Because of these distinctly different concerns and the protections that evolved in the case law to guard against them, I would hold that *Bruton* and its progeny remain good law, applicable even to nontestimonial statements.

Here, Nollette confessed to Solem that he and a "friend" robbed the casino. Being a joint trial, with only two defendants, "friend" obviously implicates Wilcoxon. This

28

required application of *Bruton*'s protections, and the trial court's failure to do so was constitutional error.

Nollette's confession played a crucial role in the State's case. Without it, the remaining untainted evidence was not so overwhelming as to necessarily lead to a finding of guilt, the constitutional harmless error standard. Accordingly, admitting Nollette's confession violated Wilcoxon's confrontation clause rights, it was not harmless error, and his conviction should be vacated. For these reasons, I respectfully dissent.

_Madsen, C.J._

_Gordon McCloud, J._

_Wiggins, J._

_Stephens, J._