# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2014AP1623-CR |
| COMPLETE TITLE: | State of Wisconsin, |
| | Plaintiff-Respondent-Petitioner, |
| | v. |
| | Raymond L. Nieves, |
| | Defendant-Appellant. |

REVIEW OF A DECISION OF THE COURT OF APPEALS
Reported at 370 Wis. 2d 260, 881 N.W. 2d 358
(2016 – Unpublished)

| | |
|---|---|
| OPINION FILED: | June 29, 2017 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | January 19, 2017 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Milwaukee |
| JUDGE: | Richard J. Sankovitz and Jeffrey A. Wagner |

| | |
|---|---|
| JUSTICES: | |
| CONCURRED: | |
| DISSENTED: | A.W. BRADLEY, J. dissents, joined by ABRAHAMSON, J. (opinion filed). |
| NOT PARTICIPATING: | |

ATTORNEYS:

For the plaintiff-respondent-petitioner, there were briefs filed by *Misha Tseytlin*, solicitor general, with whom on the briefs were *Brad D. Schimel,* attorney general, and *Daniel P. Lennington*, deputy solicitor general, and an oral argument by *Daniel P. Lennington.*

For the defendant-appellant, there was a brief filed by *John J. Grau* and *Grau Law Office*, Waukesha, and an oral argument by *John J. Grau.*

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2014AP1623-CR

(L.C. No. 2010CF5111)

STATE OF WISCONSIN                    :          IN SUPREME COURT

**State of Wisconsin,**

      **Plaintiff-Respondent-Petitioner,**

      **v.**

**Raymond L. Nieves,**

      **Defendant-Appellant.**

**FILED**

**JUN 29, 2017**

Diane M. Fremgen
Clerk of Supreme Court

REVIEW of a decision of the Court of Appeals. *The decision of the court of appeals is reversed and cause remanded to the court of appeals.*

¶1    PATIENCE DRAKE ROGGENSACK, C.J.  We review a decision of the court of appeals[1] vacating the judgment of conviction of Raymond Nieves (Nieves) and remanding for a new trial. Nieves was convicted of first-degree intentional homicide, as a party to the crime and with the use of a dangerous weapon[2] and

_____

[1] State v. Nieves, No. 2014AP1623-CR, unpublished slip op. (Wis. Ct. App. Apr. 5, 2016).

[2] See Wis. Stat. § 940.01(1)(a) (2009-10); § 939.50(3)(a);

(continued)

attempted first-degree intentional homicide, as a party to the crime and with the use of a dangerous weapon.[3] Nieves' argument on appeal is two-fold. First, Nieves argues the circuit court erred when it denied his pretrial motion to sever his trial from the trial of his co-defendant, Johnny Maldonado (Maldonado). Nieves contends the circuit court's failure to sever the trials and the subsequent admission of Maldonado's inculpatory statements violated his rights under Bruton v. United States, 391 U.S. 123 (1968) and Wis. Stat. § 971.12(3) (2009-10).[4] Second, Nieves contends that the circuit court erred in admitting the statement of "Boogie Man" because it was inadmissible hearsay.

¶2 We conclude that Crawford v. Washington, 541 U.S. 36 (2004) and its progeny limited the application of the Bruton doctrine to instances in which a co-defendant's statements are testimonial. Therefore, Bruton is not violated by the admission of a non-testifying co-defendant's statements that are nontestimonial. In the present case, Maldonado's statements were nontestimonial, and therefore Nieves' confrontation rights were not violated. Accordingly, the circuit court did not err in denying Nieves' motion to sever the trials.

---

§ 939.05; and § 939.63(1)(b).

[3] See Wis. Stat. § 940.01(1)(a) (2009-10); § 939.50(3)(a); § 939.32; § 939.05; and § 939.63(1)(b).

[4] All subsequent references to the Wisconsin Statutes are to the 2009-10 version unless otherwise indicated.

¶3 Moreover, even if Wis. Stat. § 971.12(3) had been violated, we conclude that any error was harmless. Likewise, the admission of the hearsay statement of "Boogie Man" during David's[5] testimony was also harmless. Each alleged error was inconsequential when viewed in light of the subsequent testimony of David, the surviving victim.

¶4 Accordingly, we reverse the decision of the court of appeals, reinstate Nieves' judgment of conviction, and remand to the court of appeals for consideration of Nieves' ineffective assistance of counsel claim.[6]

## I. BACKGROUND

¶5 On October 9, 2010, the State filed a criminal complaint charging Nieves and Maldonado with first-degree intentional homicide, as a party to the crime and with the use of a dangerous weapon, and attempted first-degree intentional homicide, as a party to the crime and with the use of a dangerous weapon. The complaint alleged that Nieves and Maldonado were involved in a shooting that resulted in the death of Spencer Buckle (Buckle) as well as injuries to David.

¶6 The State sought to try Nieves and Maldonado jointly. Nieves filed a motion to sever the trials. The State planned to present the testimony of Ramon Trinidad (Trinidad), a fellow

---

[5] David is a pseudonym for the surviving victim. See Wis. Stat. § 809.19(1)(g).

[6] Nieves' ineffective assistance of counsel claim was raised but not addressed by the court of appeals.

inmate of both Nieves and Maldonado at the Milwaukee County Criminal Justice Facility. The crux of Trinidad's testimony was statements made to him by Maldonado that inculpated Maldonado and, arguably, Nieves. This testimony, Nieves maintained, would violate his rights under Bruton. However, the State represented to the court that it could present the testimony in such a way that Trinidad's testimony would inculpate only Maldonado, not Nieves. Accordingly, the circuit court denied Nieves' motion to sever the joint trial.

¶7 At trial, the State presented a number of witnesses that testified to Nieves' involvement in the homicide and attempted homicide. One of these witnesses was the surviving victim, David.

¶8 David provided an extensive account of the crimes for which Nieves was charged. Specifically, David testified to the following. Nieves, Maldonado, Buckle, and an individual nicknamed "Fat Boy" were involved in a shooting in Waukegan, Illinois. Each of these men was a member of the Maniac Latin Disciples gang, and the shooting was retaliatory and against a different gang, the Latin Kings. Following the shooting in Waukegan, Nieves, Maldonado, Buckle, and David dropped off "Fat Boy" and then fled to Nieves' house in Kenosha, Wisconsin. It was during this time that "Boogie Man" visited the home at which they were staying. "Boogie Man" told David that Nieves and

4

Maldonado were planning to kill him.[7] While at Nieves' home in Kenosha, Nieves did not allow David to communicate with anyone.

¶9 David testified that Nieves and Maldonado took him and Buckle to an alley under the guise of moving to a new home in which they could hide. The four men exited the car when they arrived at the new hiding place and began to walk into an alley. It was then that David testified he heard a gunshot and saw a light flash. He saw Buckle fall to the ground. David heard more gun shots and saw more flashes and threw himself to the ground in an effort to play dead. From his position on the ground, David testified that he saw the tennis shoes Maldonado had been wearing move directly in front of him. David then heard additional gunshots and felt a bullet pass through the hood of his sweatshirt. The gunshots narrowly missed his head, but one of his hands was grazed. Before David heard the gunshots, he had not seen any one else in the alley.

¶10 Trinidad, the jailhouse informant, also testified at the trial.[8] Specifically, he testified to conversations he had with both Nieves and Maldonado while they were in jail. With respect to Nieves, Trinidad's testimony was brief. Trinidad

---

[7] Defense counsel objected to this testimony and argued it was inadmissible hearsay. The objection was overruled. This portion of David's testimony is provided more fully later in our opinion.

[8] Trinidad testified he received leniency in his own case in exchange for his testimony. However, this exchange occurred after Trinidad brought the statements to law enforcement's attention.

5

testified that Nieves, in reference to David, had indicated "[h]e got his guy."

¶11 However, the information conveyed to Trinidad by Maldonado was much more extensive.[9] Trinidad testified that Maldonado indicated he had killed Buckle and tried to kill David in order to ensure that they did not speak to police regarding the homicide in Waukegan.[10] At trial, Trinidad relayed several details of the crime, including where Nieves, Maldonado, and the others were staying before the homicide. Finally, Trinidad testified that Maldonado told him: "They brought them to a dark alley, if I'm not mistaken, and laid them on the ground. And then when he shot, he shot through the hoody. He thought he killed the victim, but it turned out to be that he played dead on him."

¶12 The jury found Nieves guilty on both counts for which he was charged. Nieves filed a postconviction motion and argued, in relevant part, that the circuit court erred in denying his motion to sever his trial from Maldonado's trial pursuant to Bruton, and that the circuit court erred in admitting the hearsay testimony of "Boogie Man." On June 24,

---

[9] If other prisoners were around, Maldonado spoke to Trinidad in Spanish to prevent them from understanding their conversations.

[10] When testifying as to what Maldonado had told him, Trinidad used the term "they" instead of referring to Nieves directly.

6

2014, the circuit court entered an order denying Nieves' postconviction motion.

¶13 Nieves appealed the judgment of conviction as well as the circuit court's denial of his postconviction motion. The court of appeals reversed, and in doing so, vacated Nieves' judgment of conviction. The court of appeals concluded that the circuit court erred in failing to sever Nieves' trial from that of Maldonado, thereby leading to a violation of Nieves' rights under Wis. Stat. § 971.12(3) and Bruton.[11]

¶14 We granted the State's petition for review, in part, to address the applicability of the Bruton doctrine to nontestimonial statements in light of the Supreme Court's decision in Crawford. We now reverse the decision of the court of appeals.

## II. DISCUSSION

### A. Standard of Review

¶15 We must determine whether Nieves' Confrontation Clause rights were violated by the circuit court's failure to sever Nieves' trial from that of Maldonado. The decision on whether to sever a trial of two defendants is a discretionary matter for the circuit court. State v. Shears, 68 Wis. 2d 217, 234, 229 N.W.2d 103 (1975). However, whether a defendant's Sixth

---

[11] The court of appeals did not address the impact of the Supreme Court's decision in Crawford v. Washington, 541 U.S. 36 (2004) on the Bruton doctrine as the State had not argued it. The State first raised the issue in a motion for reconsideration following the court of appeals' decision.

7

Amendment Confrontation Clause rights were violated by the admission of evidence at a joint trial "is a question of constitutional law subject to independent review." State v. Mattox, 2017 WI 9, ¶19, 373 Wis. 2d 122, 890 N.W.2d 256 (citing State v. Williams, 2002 WI 58, ¶7, 253 Wis. 2d 99, 644 N.W.2d 919). "We generally apply United States Supreme Court precedents when interpreting" the Sixth Amendment and the analogous Article 1, Section 7 of the Wisconsin Constitution. State v. Jensen, 2007 WI 26, ¶13, 299 Wis. 2d 267, 727 N.W.2d 518 (2007).

¶16 Moreover, we must also determine if the circuit court erred in admitting the statements of Ramon Trinidad or "Boogie Man." "We review a circuit court's decision to admit or exclude evidence under an erroneous exercise of discretion standard." Martindale v. Ripp, 2001 WI 113, ¶28, 246 Wis. 2d 67, 629 N.W.2d 698 (citing Morden v. Continental AG, 2000 WI 51, ¶81, 235 Wis. 2d 325, 611 N.W.2d 659).

¶17 "An erroneous exercise of discretion in admitting or excluding evidence does not necessarily lead to a new trial. [We] must conduct a harmless error analysis to determine whether the error 'affected the substantial rights of the party.' If the error did not affect the substantial rights of the party, the error is considered harmless." Id., ¶30; see also Wis. Stat. § 805.10. "An error affects the substantial rights of a party if there is a reasonable probability of a different

8

outcome." State v. Kleser, 2010 WI 88, ¶94, 328 Wis. 2d 42, 786 N.W.2d 144.

### B. The Bruton Doctrine

¶18 "Both the Sixth Amendment to the United States Constitution and the Wisconsin Constitution guarantee a criminal defendant the right to confront witnesses who testify against the defendant at trial." State v. Mattox, 373 Wis. 2d 122, ¶20; see also U.S. Const. amend. VI; Wis. Const. art. 1, § 7.

¶19 In contrast, "[t]he privilege, or right, to remain silent afforded by the Fifth Amendment comes into play when a defendant is compelled to give testimony that is incriminating." State v. Sahs, 2013 WI 51, ¶97, 347 Wis. 2d 641, 832 N.W.2d 80 (Roggensack, J., concurring) (citing Minnesota v. Murphy, 465 U.S. 420, 426 (1984)).

¶20 The right of confrontation and the right against self-incrimination do not always co-exist gracefully. A defendant tried jointly with a co-defendant has a Sixth Amendment right to confront a testimonial, out-of-court statement of a co-defendant who, in turn, has a Fifth Amendment right not to testify. It is this tension that the Supreme Court sought to address in Bruton v. United States, 391 U.S. 123 (1968). See State v. Avery, 215 Wis. 2d 45, 51, 571 N.W.2d 907 (Ct. App. 1997) ("The Court [in Bruton] explained that although the defendant would have the Sixth Amendment right to cross-examine the codefendant, the exercise of that right would be impossible at a joint trial because the codefendant could not be compelled to testify.").

9

¶21 In Bruton, the defendant, Bruton, and his co-defendant, Evans, were tried jointly for armed postal robbery. Bruton, 391 U.S. at 124. Evans confessed to a postal inspector that Evans and Bruton had committed the crime for which they were charged. Id. "The postal inspector obtained the oral confession, and another in which Evans admitted he had an accomplice whom he would not name, in the course of two interrogations of Evans at the city jail in St. Louis, Missouri, where Evans was held in custody on state criminal charges." Id.

¶22 At trial, Evans' confession was introduced. Id. However, Evans exercised his right not to testify at the trial. Id. The trial court instructed the jury that Evans' confession could be considered evidence only against Evans; the jury was not to consider the confession as evidence against Bruton. Id. at 124-25. The trial court reasoned that the limiting instruction sufficiently protected Bruton's rights under the Confrontation Clause.

¶23 The Supreme Court rejected the trial court's supposition that a limiting instruction sufficiently alleviated any constitutional problem that resulted from admitting Evans' confession. Id. at 137. The Court said that an out-of-court statement made by a co-defendant that inculpates a defendant cannot be introduced at trial when the co-defendant does not take the stand. Id. at 126; see also Richardson v. Marsh, 481 U.S. 200, 206 (1987) (reasoning "where two defendants are tried jointly, the pretrial confession of one cannot be admitted

10

against the other unless the confessing defendant takes the stand"). The introduction of such statements, the Court held, violates the defendant's rights under the Confrontation Clause.[12] Id. (holding, the "admission of Evans' confession in this joint trial violated petitioner's right of cross-examination secured by the Confrontation Clause of the Sixth Amendment."); see also id. at 137 ("Despite the concededly clear instructions to the jury to disregard Evans' inadmissible hearsay evidence inculpating petitioner, in the context of a joint trial we cannot accept limiting instructions as an adequate substitute for petitioner's constitutional right of cross-examination.").

¶24 The court of appeals in the present case concluded that the introduction of Maldonado's statements inculpating Nieves presented a paradigmatic Confrontation Clause violation under the Bruton doctrine. However, since Bruton was decided, the Supreme Court has manifestly changed the framework under

---

[12] The Supreme Court has since limited the Bruton doctrine in certain ways. For example, in Richardson v. Marsh, the Court concluded that a redacted confession that did not reference a co-defendant fell outside the scope of the Confrontation Clause. 481 U.S. 200, 210 (1987); see also Gray v. Maryland, 523 U.S. 185, 195 (1998) ("We concede that Richardson placed outside the scope of Bruton's rule those statements that incriminate inferentially.").

In the present case, the State argues that Trinidad's testimony, on its face, does not directly inculpate Nieves. Therefore, the State contends, the testimony falls outside the scope of Bruton. Because we conclude that a Bruton violation must involve a testimonial statement, and, as we explain below, the statement at issue in this case was nontestimonial, we need not address this issue.

11

which we analyze the Confrontation Clause, which limits the application of the Clause to testimonial statements.

## C. Crawford and Its Progeny

¶25 The Supreme Court's Confrontation Clause jurisprudence at the time Bruton was decided bears little resemblance to the Supreme Court's contemporary Confrontation Clause jurisprudence. When Bruton was decided, the Supreme Court evaluated the Confrontation Clause under the analytical framework set forth in Ohio v. Roberts, 448 U.S. 56 (1980). The touchstone of the Confrontation Clause under Roberts was the nebulous notion of "reliability." See Crawford, 541 U.S. at 63 ("Reliability is an amorphous, if not entirely subjective, concept."). Under Roberts, "an unavailable witness's out-of-court statement [could] be admitted so long as it has adequate indicia of reliability——i.e., falls within a 'firmly rooted hearsay exception' or bears 'particularized guarantees of trustworthiness.'" Id. at 42 (quoting Roberts, 448 U.S. at 66).

¶26 However, in Crawford v. Washington, the Supreme Court repudiated Roberts and fundamentally altered the way in which courts analyze the Confrontation Clause. See Ohio v. Clark, 135 S. Ct. 2173, 2184 (2015) (Scalia, J., concurring) (referring to Crawford as a "categorical overruling" and a "thorough repudiation" of the Ohio v. Roberts line of Confrontation Clause cases). The Supreme Court reasoned that "[l]eaving the regulation of out-of-court statements to the law of evidence would render the Confrontation Clause powerless to prevent even

12

the most flagrant inquisitorial practices." Crawford, 541 U.S. at 51. Therefore, the Court in Crawford rejected the basic tenet of Roberts; reliability cannot be, and is not, the touchstone of the Confrontation Clause. In so doing, the Court re-focused its analysis of the Confrontation Clause on the text of the Sixth Amendment.

¶27 "The Sixth Amendment's Confrontation Clause provides that, '[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him.'" Id. at 42. The Clause "applies to 'witnesses' against the accused——in other words, those who 'bear testimony.'" Id. at 51 (quoting 2 N. Webster, An American Dictionary of the English Language (1828)). As such, the Court reasoned, "[t]he constitutional text, like the history underlying the common-law right of confrontation, thus reflects an especially acute concern with a specific type of out-of-court statement." Id.

¶28 Accordingly, the Court in Crawford "held a defendant's right to confrontation is violated if the trial court receives into evidence out-of-court statements by someone who does not testify at the trial if those statements are 'testimonial' and the defendant has not had 'a prior opportunity' to cross-examine the out-of-court declarant." Mattox, 2017 WI 9, ¶24; see also Crawford, 541 U.S. at 68 ("Where testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination.").

13

¶29 The Court in Crawford did not directly address the application of the Confrontation Clause to nontestimonial statements. However, subsequent Supreme Court cases have seized on what Crawford insinuated; the Confrontation Clause applies only to testimonial statements. See Davis v. Washington, 547 U.S. 813, 823 (2006). It follows that the Confrontation Clause does not apply to nontestimonial statements. Id.; see also Michigan v. Bryant, 562 U.S. 344, 359 (2011) (reasoning "the admissibility of a [non-testimonial] statement is the concern of state and federal rules of evidence, not the Confrontation Clause"); Whorton v. Bockting, 549 U.S. 406, 420 (2007) ("Under Crawford, on the other hand, the Confrontation Clause has no application to [non-testimonial] statements . . . .").

¶30 Consequently, as a threshold matter, a defendant cannot show that his or her rights under the Confrontation Clause were violated before first showing that the allegedly impermissible statements were testimonial.

### D.  Reconciling Bruton and Crawford

¶31 Indisputably, Crawford engendered a seismic shift in how courts analyze the Confrontation Clause. However, we must determine whether, as a result of this doctrinal shift, the Bruton doctrine was limited to cases in which a non-testifying co-defendant's statement was testimonial.

¶32 Both Bruton and Crawford are, fundamentally, Confrontation Clause cases. Crawford and its progeny illuminate the scope of the Confrontation Clause, whereas Bruton

14

illustrates a specific type of Confrontation Clause violation. "[B]ecause <u>Bruton</u> is no more than a by-product of the Confrontation Clause, the Court's holdings in <u>Davis</u> and <u>Crawford</u> likewise limit <u>Bruton</u> to testimonial statements." <u>U.S. v. Berrios</u>, 676 F.3d 118, 128 (3d Cir. 2012). And, as a result, "we are obliged to 'view <u>Bruton</u> through the lens of <u>Crawford</u>' and, in doing so, we consider 'whether the challenged statement is testimonial.'" <u>United States v. Clark</u>, 717 F.3d 790, 816 (10th Cir. 2013) (quoting <u>United States v. Figueroa-Cartagena</u>, 612 F.3d 69, 85 (1st Cir. 2010)).

¶33 We are not the first state to conclude that <u>Crawford</u> limited the application of the <u>Bruton</u> doctrine to testimonial statements. For example, a majority of the justices of the Supreme Court of Washington[13] reached the same conclusion in <u>State v. Wilcoxon</u>, 373 P.3d 224 (Wash. 2016). The court reasoned that, after <u>Crawford</u>, "the scope of the confrontation right encompasses only testimonial statements. Its protections

---

[13] The decision we cite was that of a plurality of the court. However, the concurring justice agreed with the plurality as to the issues relevant to our decision. See <u>State v. Wilcoxon</u>, 373 P.3d 224, 231 (Wash. 2016) (Gonzalez, J., concurring) ("I agree with the lead opinion that <u>Bruton</u> and the confrontation clause did not apply to the out-of-court statements at issue before us. A threshold question in determining when the confrontation clause applies is whether the out-of-court statement was procured by the government. We should treat statements that were not procured by the government as presumptively nontestimonial. Thus, their admissibility should be governed by the rules of evidence, not the confrontation clause.").

simply do not apply to nontestimonial statements, whether in the context of a single defendant like in Crawford or codefendants like in Bruton." Id. at 229. Accordingly, the court held "that when an out-of-court statement made by a nontestifying codefendant is nontestimonial, Bruton is inapplicable because such statements are outside the scope of the confrontation clause." Id.; see also Burnside v. State, 352 P.3d 627, 643 (Nev. 2015) (reasoning, "if the challenged out-of-court statement by a nontestifying codefendant is not testimonial, then Bruton has no application because the Confrontation Clause has no application."); Thomas v. United States, 978 A.2d 1211, 1224-25 (D.C. 2009) (same); State v. Gurule, 303 P.3d 838, 848 (N.M. 2013) (same).

¶34 Our reasoning is also in accord with the majority of federal circuit courts that have addressed the issue. These courts all followed the logic we employ in the present case: Crawford altered the scope of the Confrontation Clause, which, in turn, limited the application of the Bruton doctrine. United States v. Berrios, 676 F.3d 118, 128 (3d Cir. 2012) ("Any protection provided by Bruton is therefore only afforded to the same extent as the Confrontation Clause, which requires that the challenged statement qualify as testimonial."); United States v. Figueroa-Cartagena, 612 F.3d 69, 85 (1st Cir. 2010) ("It is . . . necessary to view Bruton through the lens of Crawford and Davis."); United States v. Wilson, 605 F.3d 985, 1017 (D.C. Cir. 2010) ("The appellants have no Bruton claim, however, because

16

Franklin's concessions through counsel do not implicate the Confrontation Clause."); United States v. Johnson, 581 F.3d 320, 326 (6th Cir. 2009) ("Because it is premised on the Confrontation Clause, the Bruton rule, like the Confrontation Clause itself, does not apply to nontestimonial statements."); United States v. Spotted Elk, 548 F.3d 641, 662 (8th Cir. 2008) (Bruton does not apply to nontestimonial statements); Clark, 717 F.3d at 816 (same).

¶35 Therefore, the Bruton doctrine was limited by Crawford. And, as a result, a defendant has a viable Bruton claim only insofar as the inculpatory statements at issue are testimonial under Crawford and its progeny.[14]

E. Confrontation Clause, Application

1. Definition of Testimonial

¶36 We must analyze whether the statements at issue in the present case were testimonial. If not, then the Confrontation Clause does not apply, and Nieves does not have a viable claim under Bruton. We again look to Crawford and its progeny, this time to determine the scope of "testimonial."

_____

[14] For an extensive discussion of the effect Crawford had on Bruton see John M. Leventhal, Is Bruton on Life Support in the Aftermath of Crawford v. Washington?, 43 Am. J. Crim. L. 1, 17 (2015) ("Now that non-testimonial statements are no longer subject to Confrontation Clause scrutiny, and post-Crawford decisions have not applied Bruton to non-testimonial statements, defendants must look to other avenues in an attempt to prevent a non-testifying co-defendant's incriminating statement made to a civilian from being admitted.").

¶37 The Court in Crawford explained that testimony, at the time the Sixth Amendment was passed, was defined as "'[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.' [2 N. Webster, An American Dictionary of the English Language (1828)]. An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." Crawford, 541 U.S. at 51. "Statements taken by police officers in the course of interrogations are also testimonial under even a narrow standard." Id. at 52. Despite this discussion, the Court in Crawford did not purport to provide a complete definition of "testimonial." Id. Subsequent cases, however, have provided further guidance as to the types of statements that fall within the contours of the Confrontation Clause.

¶38 As with Crawford, the Supreme Court in Davis v. Washington, 126 S. Ct. 2266 (2006) addressed the definition of testimonial in the context of a statement given to a law enforcement officer. The Court adopted a "primary purpose" test for analyzing whether a statement is testimonial. Davis, 547 U.S. at 822. "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." Id. Statements may be "testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to

18

establish or prove past events potentially relevant to later criminal prosecution." Id.

¶39 Subsequently, in Michigan v. Bryant, the Court "reiterated [its] view in Davis that, when 'the primary purpose of an interrogation is to respond to an 'ongoing emergency,' its purpose is not to create a record for trial and thus is not within the scope of the [Confrontation] Clause.'" Clark, 135 S. Ct. at 2180 (quoting Bryant, 562 U.S. at 358). However, the Court clarified that "'the existence vel non of an ongoing emergency is not the touchstone of the testimonial inquiry.' Rather, the existence of an emergency is just one factor when determining the primary purpose of an interrogation." Bryant, 562 U.S. at 374.

¶40 In its most recent Confrontation Clause case, Ohio v. Clark, the Supreme Court was "presented [with a] question [it had] repeatedly reserved: whether statements to persons other than law enforcement officers are subject to the Confrontation Clause." Clark, 135 S. Ct. at 2181. The Court acknowledged the applicability of the primary purpose test in such cases: "In the end, the question is whether, in light of all the circumstances, viewed objectively, the 'primary purpose' of the conversation was to 'creat[e] an out-of-court substitute for trial testimony.'" Id. at 2180 (quoting Bryant, 562 U.S. at 358). However, the Court cautioned that even though "statements to individuals who are not law enforcement officers could conceivably raise confrontation concerns . . . such statements

19

are much less likely to be testimonial than statements to law enforcement officers." Id. at 2181.

¶41 Moreover, the Supreme Court in Clark explained that the formality of the setting in which the statements were given is relevant to whether the statements were "made with the primary purpose of creating evidence for [the defendant's] prosecution." Id. at 2176. "A 'formal station-house interrogation,' like the questioning in Crawford, is more likely to provoke testimonial statements, while less formal questioning is less likely to reflect a primary purpose aimed at obtaining testimonial evidence against the accused." Id. at 2180 (quoting Bryant, 562 U.S. at 366); see also Jensen, 299 Wis. 2d 267, ¶33 ("In essence, we conclude that Julie's statements were informally made to her neighbor and her son's teacher and not under circumstances which would lead an objective witness to reasonably conclude they would be available at a later trial, and as such are nontestimonial.").

¶42 Therefore, statements given in an informal setting are significantly less likely to be testimonial. See United States v. Castro-Davis, 612 F.3d 53, 65 (1st Cir. 2010) (concluding statements were nontestimonial because the defendant "did not make the statements to a police officer, during the course of an interrogation, or in a structured setting designed to elicit responses that intended to be used to prosecute him."); United States v. Smalls, 605 F.3d 765, 780 (10th Cir. 2010) ("Cook in no sense intended to bear testimony against Defendant Smalls;

20

Cook in no manner sought to establish facts for use in a criminal investigation or prosecution.").

¶43 The context in which a statement is made is also significant in determining whether a statement is testimonial. Clark, 135 S. Ct. at 2182. And, "part of that context is the questioner's identity." Id. "Statements made to someone who is not principally charged with uncovering and prosecuting criminal behavior are significantly less likely to be testimonial than statements given to law enforcement officers." Id.

¶44 For this reason, statements to non-law enforcement individuals are unlikely to be testimonial, id., as are statements made unwittingly to non-law enforcement personnel acting as an informant for law enforcement. Davis, 547 U.S. at 825 ("statements made unwittingly to a Government informant" are "clearly nontestimonial"); see also United States v. Dale, 614 F.3d 942, 956 (8th Cir. 2010) (statements made to an individual wearing a wire to record conversation for the police were not testimonial); United States v. Udeozor, 515 F.3d 260, 270 (4th Cir. 2008) ("Because [the declarant] plainly did not think he was giving any sort of testimony when making his statements to the victim during the recorded telephone calls, the admission of these two taped conversations into evidence did not violate [the defendant's] rights under the Confrontation Clause."); United States v. Watson, 525 F.3d 583, 589 (7th Cir. 2008) ("A statement unwittingly made to a confidential informant and

21

recorded by the government is not 'testimonial' for Confrontation Clause purposes.").

¶45 Therefore, under the Supreme Court's analysis, statements between certain types of individuals are highly unlikely to be testimonial. For example, the Supreme Court indicated that the statements in Dutton v. Evans, 400 U.S. 74, 87-89 (1970) (plurality opinion), were "clearly nontestimonial" because the "statements [were] from one prisoner to another." Davis, 547 U.S. at 825; see also United States v. Pelletier, 666 F.3d 1, 9 (1st Cir. 2011) ("Although we have not previously had occasion to apply Davis to the situation presented here——statements made by one inmate to another——we have little difficulty holding that such statements are not testimonial."); Smalls, 605 F.3d at 778 ("[Declarant's] recorded statement to CI, known to [declarant] only as a fellow inmate, is unquestionably nontestimonial.").

## 2. Maldonado's Statements

¶46 In the present case, Maldonado made several statements to a fellow inmate, Trinidad, that implicated him and arguably Nieves in the crime for which they were charged.[15] Trinidad testified that the conversation between him and Maldonado occurred while both were housed at the Milwaukee County Criminal Justice Facility.

---

[15] We are assuming for purposes of this analysis that the testimony implicated Nieves under Bruton. However, we reiterate that we are not deciding whether this would have been a Bruton violation if not for Crawford.

¶47 Manifestly, these statements were not taken in what can be considered a formal setting. The statements were made in a jail and were the product of the casual conversations of two inmates. There is nothing to suggest that an objective observer would believe that these statements would later be used at trial.

¶48 The context of the statements, including to whom the statements were made, also suggests that the statements are nontestimonial. Maldonado was speaking to a fellow inmate; he was not conversing with a law enforcement officer or anyone that he would have reason to suspect would later use the testimony at a trial. The statements at issue were the result of a conversation between two inmates——the type of statement that the Supreme Court and other courts have categorized as unequivocally nontestimonial.

¶49 Notably, Maldonado's statements inculpated himself as well. Trinidad testified that Maldonado spoke to him about his role in the homicide and the attempted homicide——not just the role of Nieves or other individuals. An objective observer would, therefore, be unlikely to consider these statements to have been made with the primary purpose of creating evidence for trial. See United States v. Volpendesto, 746 F.3d 273, 289-90 (7th Cir. 2014) ("Instead, we evaluate their conversation objectively. And from an objective perspective, [the] conversation looks like a casual, confidential discussion between co-conspirators. Because the statements in question

23

were not testimonial, their admission did not implicate the Confrontation Clause."). After all, these conversations created evidence that could be, and ultimately was, used at trial against Maldonado. See Smalls, 605 F.3d at 779 ("Cook did not make his statement to CI for the 'primary purpose' of establishing or proving facts relevant to a criminal prosecution" because "Cook would not have shared what he did had he known the Government was recording his statement or that his cellmate was a CI.").

¶50 There is no indication these statements were made for the primary purpose of creating evidence for Nieves' prosecution. Instead, Maldonado simply trusted the wrong person; he confided in a jailhouse informant.

¶51 Consequently, we see no reason to depart from the Supreme Court's acknowledgement in Davis that the statements in Dutton were "clearly non-testimonial" because they were statements between inmates. The statements in the present case display none of the formalistic characteristics that have come to define the contours of testimonial hearsay. "Certainly, the statements in this case are nothing like the notorious use of ex parte examination in Sir Walter Raleigh's trial for treason, which [the Supreme Court has] frequently identified as 'the principal evil at which the Confrontation Clause was directed.'" Clark, 135 S. Ct. at 2182 (quoting Crawford, 541 U.S. at 50).

24

F.  Alleged Violation of Wis. Stat. § 971.12(3)

¶52 Nieves argues that the circuit court violated Wis. Stat. § 971.12(3) by declining to sever his and Maldonado's trials and admitting the testimony of Trinidad.[16]  We need not examine whether our conclusion that Nieves' Confrontation Clause rights were not violated forecloses Nieves' argument under § 971.12(3).[17]  Instead, even assuming that § 971.12(3) had been violated, we conclude that the putative error was harmless.  The overwhelming evidence the State presented at trial of Nieves' guilt leads us to conclude that he would have been found guilty of the crimes for which he was convicted even if the circuit court had excluded Trinidad's testimony.

---

[16] Wisconsin Stat. § 971.12(3) provides, in relevant part, a "district attorney shall advise the court prior to trial if the district attorney intends to use the statement of a codefendant which implicates another defendant in the crime charged. Thereupon, the judge shall grant a severance as to any such defendant."  Wis. Stat. § 971.12(3).

[17] Nothing in this opinion should be construed so as to cast doubt on our cases that hold Wis. Stat. § 971.12(3) is a mechanism for enforcing Bruton v. United States, 391 U.S. 123 (1968), and therefore, does not "require[] severance of defendants in all instances in which law enforcement authorities possess a statement by a codefendant implicating another defendant.  We do not believe such an argument would be viable. The legislative committee note indicates that the statute is intended to provide a mechanism to insure compliance with Bruton.  As we have stated, compliance may be had with Bruton by effectively excising any reference implicating a codefendant and by instructing the jury as to the limited purpose for which the evidence is admitted.  If this is done, the statement no longer 'implicates another defendant' and therefore does not fall within the prohibition of the statute."  Pohl v. State, 96 Wis. 2d 290, 301, 291 N.W.2d 554 (1980) (quoting Cranmore v. State, 85 Wis. 2d 722, 747, 271 N.W.2d 402 (Ct. App. 1978)).

25

¶53 The crux of the State's case was the testimony of the surviving victim, David, who testified at length as to the particulars of the crime and Nieves' involvement. David's testimony was salient; it was detailed, direct evidence of Nieves' involvement in the crimes for which he was convicted.

¶54 David explained the events leading up to the crimes at issue in this case. Specifically, David described how he, Buckle, Maldonado, Nieves, and others were involved in a homicide that occurred in Waukegan, Illinois. He testified:

> [State]: Okay. South Park and Water. So they come over, and do you or does anyone else in your presence explain what happened?
>
> [David]: To what happened when they shot at us?
>
> [State]: Yes
>
> [David]: Told Raymond Nieves what happened and he told us we had to go do what we had to do to get revenge.
>
> . . . .
>
> [State]: And after Raymond [Nieves] had this conversation with you guys, it's like, okay, we've got to get back, what happened next?
>
> [David]: We drove down to Woodard Park which is A Street.
>
> [State]: When you say 'we', who went?
>
> [David]: Raymond Nieves and Maldonado, Spencer, Fat Boy and me.
>
> . . . .
>
> [State]: And who got out of the car?
>
> [David]: Me, Fat Boy, Maldonado and Buckle.

26

> [State]: And does some shooting take place at these guys at the basketball court that you thought were Latin Kings?
>
> [David]: Yes.
>
> . . . .
>
> [David]: We ran back to the truck, me, Spencer, Fat Boy, and Maldonado.
>
> [State]: And where was Mr. Nieves?
>
> [David]: He was in the truck, driver's side. He was the driver.

David testified that he later discovered an individual had been killed in this shooting. And, following the Waukegan homicide, David, Buckle, Nieves, and Maldonado traveled to Kenosha and hid at the home of one of Nieves' relatives.

¶55 David revealed Nieves and Maldonado's fear that one of the participants in the Waukegan homicide would cooperate with police. This testimony provided support for the State's theory of Nieves and Maldonado's motive as the State contended that this fear provided the impetus for the homicide and attempted homicide in this case.

¶56 Importantly, David then explained the events on the day the crimes at issue in the present case were committed. He began by relaying that Nieves and Maldonado all got into a vehicle purportedly to travel to a new place at which they could hide.

> [State]: Did there actually come a point in time you actually got into a vehicle with Schotee?
>
> [David]: Yes.
>
> [State]: And did anyone else go with you?

27

[David]: Raymond Nieves, Johnny Maldonado, and Spencer Buckle.

. . . .

[State]: Okay. Did you stay in the car once the SUV stopped?

[David]: No, we didn't stay in the car.

[State]: What happened next?

[David]: Raymond Nieves and Maldonado and Buckle and I got off the car.

¶57 David then explained, in detail, the specifics of the crimes for which Nieves was eventually convicted. David testified:

[State]: What happens next. You stop there, they're on the other side of the alley, what happens?

[David]: I seen Maldonado goes up to, like, it looked like a garage to me. It was, like, a garage. I don't know if he's pretending to use a washroom or doing something. But, I don't know, Raymond Nieves was, like, there's somebody running behind you all. As we turning, I just see Spencer —— I hear a gunshot, I see a flash, and I see Spencer Buckle fall to the ground.

[State]: And who are the only four people in the alley at that point in time?

[David]: Raymond Nieves, Johnny Maldonado, Spencer Buckle and me.

[State]: Did you see any person running down the alley when Nieves said this?

[David]: No.

[State]: How close to Mr. Buckle were you at that point in time when you say you heard gunshots?

28

[David]:  At arms reach.

[State]:  And where was Mr. Nieves?

[David]:  Right next to Buckle.

[State]:  And did you know where Mr. Maldonado was at that point in time?

[David]:  He ended up behind me.  It happened so fast.

[State]:  And as these shots were being — going, fired, and you saw Mr. Buckle falling, what did you do?

[David]:  As I was turning to see, facing toward Nieves, I heard more shots and seen flashes coming my way.  So I threw myself on the ground as I was shot, like, when I really was not shot, I threw myself on the ground and played dead.  That's when I seen Johnny Maldonado's black tennis shoes come up.

. . . .

[State]:  And what happened next?

[David]:  I felt like something pressed, like a gun pressed in the back of my head.

[State]:  And then what happened?

[David]:  I just heard shots being fired towards my head, and I could feel the wind of the bullets passing through my head and I felt the burn where I got grazed at from my left hand.

[State]:  So you were shot or felt something graze your left hand?

[David]:  Yes.

[State]:  And based upon the noise and sounds, you believed it to be what?

[David]:  Gunshots.

29

¶58 David's testimony was powerful; it provided the jury with direct evidence of the crimes for which Nieves was convicted.  One of these crimes, of course, was the attempted homicide of David, who positively identified Nieves as one of the perpetrators.

¶59 In contrast, the testimony of Trinidad was much more limited than that of David, and therefore, it did not provide evidence for any aspect of the crime that the jury did not otherwise hear in more detail from David.

¶60 Accordingly, the circuit court's failure to exclude Trinidad's testimony did "not affect the substantial rights of" Nieves.  See Wis. Stat. § 805.18(1).  David, the surviving victim, explained both the events leading up to the homicide as well as the particulars of the crime.  David testified that Nieves brought Buckle and him into an alley, where they fatally shot Buckle and where they shot and wounded him.  As a result, the evidence against Nieves was such that he would have been convicted without the testimony of Trinidad.

¶61 Finally, we note that the primary harm Wis. Stat. § 971.12(3) is designed to prevent is the harm that results from a violation of an individual's Confrontation Clause rights.[18]

---

[18] We do not address cases that examine the potential prejudicial effect of a Confrontation Cause violation because we concluded that no such violation occurred in this case. See, e.g., Cruz v. New York, 481 U.S. 186, 191 (1987) (reasoning "'devastating' practical effect was one of the factors that Bruton considered in assessing whether the Confrontation Clause might sometimes require departure from the general rule that jury instructions suffice to exclude improper testimony");
(continued)

30

See generally Pohl v. State, 96 Wis. 2d 290, 301, 291 N.W.2d 554 (1980). However, as discussed above, Nieves' Confrontation Clause rights were not violated.

### G. Admission of Hearsay

¶62 At trial, David testified that a man named "Boogie Man" told him that Nieves and Maldonado were planning to kill him. Specifically, in reference to "Boogie Man," David testified as follows:

[State]: So what was said that made you concerned?

[David]: He said that they were planning on killing me, that Raymond Nieves and Maldonado were planning on killing me.

¶63 On appeal, the State concedes that the statement was improperly admitted; however, the State contends that it was harmless error to admit it. We agree that the admission of the statement, while in error, was harmless as it did not affect the substantial rights of Nieves.

¶64 The statement of "Boogie Man" preceded David's extensive and detailed account of the homicide and attempted homicide. We need not rehash David's testimony at length. It suffices to note that David testified that Nieves and Maldonado

---

Richardson v. Marsh, 481 U.S. 200, 211 (1987) ("We hold that the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when, as here, the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence."). Therefore, the harm to which these cases refer is not relevant to our harmless error analysis.

brought him and Buckle into an alley, where they fatally shot Buckle and where they wounded him.

¶65 The single statement by "Boogie Man" to David that Nieves and Maldonado planned to kill him, when viewed in context, contributed little to David's testimony. Any error that resulted from the admission of this statement was alleviated when David explained how Nieves and Maldonado fatally shot Buckle and attempted to fatally shoot him.

¶66 As a result, the circuit court's decision to admit the testimony, while it may have been error, was harmless.

### III.  CONCLUSION

¶67 In light of the foregoing, we conclude that Crawford and its progeny limited the application of the Bruton doctrine to instances in which a co-defendant's statements are testimonial. Therefore, Bruton is not violated by the admission of a non-testifying co-defendant's statements that are nontestimonial. In the present case, Maldonado's statements were nontestimonial, and therefore Nieves' confrontation rights were not violated. Accordingly, the circuit court did not err in denying Nieves' motion to sever the trials.

¶68 Moreover, even assuming that Wis. Stat. § 971.12(3) had been violated, we conclude that any error was harmless. Likewise, the admission of the hearsay statement of "Boogie Man" during David's testimony was also harmless. Each alleged error was inconsequential when viewed in light of the subsequent testimony of David, the surviving victim.

32

¶69 Accordingly, we reverse the decision of the court of appeals, reinstate Nieves' judgment of conviction, and remand to the court of appeals for consideration of Nieves' ineffective assistance of counsel claim.

*By the Court.*—The decision of the court of appeals is reversed, and the cause remanded to the court of appeals.

¶70 ANN WALSH BRADLEY, J. *(dissenting).* In no uncertain terms, the legislature enacted a statute mandating that a judge "shall grant a severance" where statements of one defendant will implicate the other in the crime charged:

> The district attorney shall advise the court prior to trial if the district attorney intends to use the statement of a codefendant which implicates another defendant in the crime charged. Thereupon, the judge **shall** grant a severance as to any such defendant.

Wis. Stat. § 972.12(3) (emphasis added).

¶71 This language is not confusing. It does not suggest multiple meanings that could render it ambiguous. Yet, the majority presents no analysis of the actual language of the statute, let alone an analysis that would lead to a conclusion that it is inapplicable.

¶72 When faced with the question of whether a trial should be severed when a codefendant's inculpatory statement will be introduced, the court's analysis need go no further than Wis. Stat. § 971.12(3). It plainly provides the answer: yes, severance shall be granted.

¶73 Instead, of applying the plain language of the statute, the majority embarks on a journey that takes us through unsettled territory, analyzing whether the United States Supreme Court in Crawford v. Washington, 541 U.S. 36 (2004), intended to limit Bruton v. United States, 391 U.S. 123 (1968). Resolution of this case does not require such a complex analytical exercise.

¶74 This approach disregards the unambiguous language of the statute, violates a bedrock principle of review that should

1

guide appellate courts and fails to recognize the nuances in Confrontation Clause jurisprudence.

¶75 Honoring the language chosen by the legislature, I take an approach at odds with that of the majority. Because I determine, based on the plain meaning of the text, that the circuit court erred in failing to sever the trials and that the error was not harmless, I respectfully dissent.

I

¶76 In State ex rel. Kalal v. Cir. Ct. for Dane Cty., 2004 WI 58, ¶24, 271 Wis. 2d 633, 681 N.W.2d 110, this court set forth a framework for statutory interpretation, which has since served to guide our analyses in cases involving statutory interpretation. It instructs that "statutory interpretation 'begins with the language of the statute. If the meaning of the statute is plain, we ordinarily stop the inquiry.'" Id., ¶45 (quoting Seider v. O'Connell, 2000 WI 77, Wis. 2d 473, 613 N.W.2d 591).

¶77 The court provided strong justification for this rule. Focusing on the different roles of the judiciary and the legislature, it explained that the judiciary has a "solemn obligation . . . to faithfully give effect to the laws enacted by the legislature . . . ." Id., ¶44. Courts are to give deference to the policy choices made by the legislature, and deference "requires that statutory interpretation focus primarily on the language of the statute." Id.

¶78 As further justification for focusing on the plain language of the statute, Kalal explained that ultimately, "[i]t

2

is the enacted law, not the unenacted intent, that is binding on the public." Id., ¶46.

¶79 Here, the language is unambiguous. Wisconsin Stat. § 971.12(3) mandates that a judge shall grant a severance where statements of one defendant will implicate the other in the crime charged:

> The district attorney shall advise the court prior to trial if the district attorney intends to use the statement of a codefendant which implicates another defendant in the crime charged. Thereupon, the judge **shall** grant a severance as to any such defendant.

Wis. Stat. § 972.12(3) (emphasis added).

¶80 Despite the statute's clear answer to the question before us, the majority barely references it. Indeed, its sole reference to Wis. Stat. § 971.12(3) is relegated to a footnote where it asserts that severance is not required where a codefendant's statement does not implicate a defendant——an assertion that is not at issue in this case and against which no one is arguing. Majority op., ¶52 n.17.

¶81 Nowhere in the majority opinion is the actual language of the statute analyzed. Instead, it bypasses a Kalal analysis entirely. In so doing, the majority fails to give deference to the legislature as required.

II

¶82 Not only does the majority fail to defer to the plain language of the statute, it also violates a longstanding principle of appellate court practice by conducting an unnecessary constitutional analysis. This court has repeatedly

3

stated that appellate courts should decide cases on the narrowest grounds possible.  Md. Arms Ltd. P'ship v. Connell, 2010 WI 64, ¶48, 326 Wis. 2d 300, 786 N.W.2d 15 ("[A]n appellate court should decide cases on the narrowest possible grounds."); Ehlinger v. Hauser, 2010 WI 54, ¶66, 325 Wis. 2d 287, 785 N.W.2d 328 ("Typically, an appellate court should decide cases on the narrowest possible grounds."); State v. Castillo, 213 Wis. 2d 488, 492, 570 N.W.2d 44 (1997) (same).

¶83 Thus, when a question presented can be answered by statute, we typically leave interpretation of federal and state constitutional provisions for another day.  See, e.g., State v. Popenhagen, 2008 WI 55, ¶5, 309 Wis. 2d 601, 749 N.W.2d 611 ("Because we affirm the circuit court's order on statutory grounds, we leave the interpretation of the federal and state constitutional provisions . . . for another case in which these issues are determinative."); HSBC Realty Credit Corp. v. City of Glendale (In re City of Glendale Cmty. Dev. Auth. Condemnation Award), 2007 WI 94, ¶14 n.7, 303 Wis. 2d 1, 735 N.W.2d 77 ("Because we decide this case on statutory grounds, we do not address the parties' arguments concerning . . . the constitutional right to interest on a condemnation award."); see also Castillo, 213 Wis. 2d at 492 ("a court will not reach constitutional issues where the resolution of other issues disposes of an appeal.").

¶84 As discussed above, the question before us can be easily addressed by a plain language interpretation of Wis. Stat. § 971.12(3).  Therefore, resorting to a complex

constitutional analysis is unnecessary.[1] Yet, the majority disregards our well established practice of deciding issues narrowly. Instead, it delves into an analysis of the impact that Crawford had on Bruton. Such an exercise in constitutional analysis is not needed to resolve this case.

### III

¶85 Not only is a constitutional analysis unnecessary, the one conducted by the majority is also unconvincing. After asserting that Crawford shifted the focus of a Confrontation Clause away from reliability and onto the testimonial nature of statement, it concludes that because Bruton is a by-product of the Confrontation Clause, Crawford's holding necessarily limits Bruton to testimonial statements. Majority op., ¶32.

¶86 To support this conclusion, the majority quotes from the lead opinion in State v. Wilcoxon, 373 P.3d 224 (2016), which stated "the scope of the confrontation right encompasses only testimonial statements . . . whether in the context of a

---

[1] Resorting to the constitutional analysis is also questionable because such an analysis likely has been forfeited here. As the court of appeals observed, it appears that the State did not raise the Crawford issue before the circuit court and the State "explicitly acknowledged that it had forfeited its argument concerning Crawford by failing to raise it on appeal. . . ." State v. Nieves, No. 2014AP1623-CR, unpublished slip op., ¶12 n.6 (Wis. Ct. App. Apr. 5, 2016).

After the State lost in the court of appeals, it raised the issue for the first time on a motion for reconsideration, which it also lost. If the majority is going to now take up and run with the State's new Crawford issue, it should at least acknowledge and address Nieves' argument that this court, like the court of appeals, should consider the issue long since forfeited.

5

single defendant like in Crawford or codefendants like in Bruton." Majority op., ¶33. This analysis overlooks the complexities in Confrontation Clause jurisprudence.

¶87 More persuasive is the analysis presented in the dissent of State v. Wilcoxon, 373 P.3d 224 (2016) (Madsen, C.J., dissenting). As Chief Justice Madsen observes, Bruton and Crawford address different concerns. Id., ¶¶48, 54-55. Where Crawford dealt with the initial admissibility of hearsay (and thus its discussion of reliability), Bruton dealt with the prejudice created by placing inadmissible hearsay before a jury. Id. Crawford did not touch upon prejudice, indeed it did not even mention Bruton. Id., ¶¶50, 53. Thus, forcing Bruton through the lens of Crawford is a poor fit. Id., ¶56. The majority's attempt to do so misses the nuance in the Supreme Court's Confrontation Clause jurisprudence.

IV

¶88 Contrary to the majority, I conclude, as did the court of appeals, that Wis. Stat. § 917.12(3) decides the question before us. When a prosecutor plans to use an inculpatory statement of a co-defendant, "the judge shall grant a severance as to any such defendant." Wis. Stat. § 917.12(3) (emphasis added).

¶89 The only issues remaining after reading this plain statutory language are whether the co-defendant's statements were inculpatory and, if so, whether the circuit court's failure to sever the trials constituted harmless error.

6

¶90 First, I consider whether the co-defendant's statements were inculpatory. These statements were entered into the record through the testimony of a state's witness at the joint trial. As they illustrate, on multiple occasion the witness used the pronoun "they" when describing the actions Maldonado took with Nieves:

> [State]: And did [Mr. Maldonado], in fact, talk about how that happened and what Mr. Maldonado's involvement was with either of these two shorties?
>
> [Witness]: They told them to come party or celebrate to Wisconsin. And they came to Kenosha, and then from Kenosha they came to Milwaukee.
>
> [State]: By "they," you mean Mr. Maldonado and the shorties?
>
> [Witness]: Yes.
>
> [State]: And after leaving Kenosha, they were going to go to Milwaukee, and what happened once they got to Milwaukee according to Mr. Maldonado?
>
> [Witness]: They brought them to a dark alley, if I'm not mistaken, and laid them on the ground. And then when he shot, he shot through the hoody. He thought he killed the victim, but it turned out to be that he played dead on him.

(emphasis added). Although the witness at times used the term "they" to describe the "two shorties," it is obvious that twice the word "they" was used to reference Maldonado and Nieves. When the witness stated "they told them" and "they brought them," it would be illogical to conclude that the "two shorties" were telling and bringing themselves.

7

¶91 The witness later referenced Nieves by name, reinforcing the implication that his prior testimony referred to both Nieves and Maldonado:

[State]: Did he talk about, when he spoke of the period of time they were in Kenosha, where they were at where he was at with the shorties in Kenosha?

[Witness]: I believe Mr. Nieves's mom's house or his baby mamma house.

¶92 On cross-examination, the following exchange between the witness and Maldonado's attorney further emphasized that the "they" referred to both Nieves and the co-defendant:

[Attorney]: Okay. You are testifying today that Mr. Maldonado told you that once they brought these other two guys from Waukegan, that they laid on the ground in the alley and then shot them; is that your testimony?

[Witness]: Yes.

(Emphasis added). Given the totality of the witness's testimony, the most reasonable conclusion for the jury to reach was that Maldonado told the witness about how he and Nieves committed the crime. Accordingly, I conclude that these out-of-court statements by Maldonado implicated Nieves in the crime and must be considered inculpatory.

¶93 Second, I consider whether admission of these inculpatory statements in violation of Wis. Stat. § 17.12(3) constituted harmless error. Such a determination requires an inquiry into "whether it was beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." State v. Moore, 2015 WI 54, ¶94, 363 Wis. 2d 376, 412, 864 N.W.2d 827, 844 (quoting State v. Magett, 2014 WI 67, ¶29, 355

8

Wis. 2d 617, 850 N.W.2d 42). The State bears the burden of proving the error was harmless. State v. Harris, 2008 WI 15, ¶42, 307 Wis. 2d 555, 745 N.W.2d 397.

¶94 Given the typically damning nature of a co-defendant's inculpatory confession, the State's burden is difficult to meet. As Bruton describes, such statements can be devastating. 391 U.S. at 136; see also Cruz, 481 U.S. at 170 (referring to the "devastating practical effects" of a co-defendant's inculpatory statements). Even when a jury is properly instructed to disregard such statements, it is unlikely such confessions will be ignored. Bruton, 391 U.S. at 129.

¶95 The potency and prejudicial effect in a joint trial of a confession by a non-testifying co-defendant that is admissible against him but inadmissible and incriminating against the other defendant cannot be minimized. Justice Frankfurter warned that the government gets the benefit of the inadmissible testimony influencing the jury "which, as a matter of law, they should not consider but which they cannot put out of their minds." Delli Paoli v. United States, 352 U.S. 232, 248 (1957) (Frankfurter, J., dissenting). Contrary to the majority in Delli, Justice Frankfurter thought that the prejudice could not be cured by a limiting instruction. Id. at 247.

¶96 The prophylactic effect of a limiting instruction in similar situations was the focus of later cases. In Richardson v. Marsh, 481 U.S. 200, 211 (1987), the Court held that when a codefendant's confession is redacted to eliminate any reference

9

to the other defendant's existence, then a limiting instruction will suffice.

¶97 Subsequently, the Court in Cruz v. New York, 481 U.S. 186 (1987), determined that a limiting instruction was insufficient to cure the harm. It held that where a nontestifying co-defendant's confession incriminating another defendant is not directly admissible against that defendant, then the risk of harm in a joint trial is too great "even if the jury is instructed not to consider it against the defendant . . . ." Id. at 193.

¶98 Here, we need not consider whether the harmful effect of this evidence can be sufficiently ameliorated by a limiting instruction, because no limiting instruction was given. The jury was never told to disregard Maldonado's out-of-court statements implicating Nieves or told that those incriminating statements could not be used against Nieves. Likewise, we need not analyze whether the redactions were sufficient, because there were no redactions.

¶99 The State relies on the victim's testimony that Nieves and Maldonado brought him to an alley and shot him. Yet, it is unclear how much weight the jury would have given it. His story had changed several times during his interviews with police. Further, portions of his testimony were inconsistent, giving rise to the likelihood that Maldonado's corroborating statements added critical weight to the witness's testimony and contributed to Nieves' conviction.

¶100 Due to the nature of the testimony and the failure of the court to give a limiting curative instruction, I determine that the State fails to meet it burden because it cannot demonstrate beyond a reasonable doubt that the error was harmless.

¶101 In sum, I conclude that the question before us is answered by the plain language of Wis. Stat. § 917.12(3) that mandates severance. Because the circuit court violated that statute and that error was not harmless, I would affirm the court of appeals decision.

¶102 I am authorized to state that Justice SHIRLEY S. ABRAHAMSON joins this dissent.

11